(No. 21981.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES BURECA *et al.* Plaintiffs in Error.

*Opinion filed December 22, 1933—Petition for rehearing stricken February 6, 1934.*

R. R. BOOKWALTER, and CHARLES M. CRAYTON, for plaintiffs in error.

OTTO KERNER, Attorney General, OLIVER D. MANN, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

James Bureca and Joseph Tropea, plaintiffs in error, (hereinafter for convenience called the defendants,) were indicted at the October term, 1932, of the Vermilion county circuit court for the murder of Ralph Towl. The case was tried at that term of court but the jury disagreed. They were tried the second time at the January, 1933, term. They were found guilty and their punishment was fixed at life imprisonment in the penitentiary. Motions for a new trial and in arrest of judgment were made and overruled, whereupon the defendants sued out a writ of error from this court.

Shortly after 8:00 o'clock in the evening of July 2, 1932, Ralph Towl, assistant manager of the Sears-Roebuck Company's store, located at 33 North Hazel street, Danville, Illinois, together with James Anderson, a clerk, left the store to deposit the day's receipts in one of the Danville banks. Towl had the money in a canvas bag. As they left the store James Bureca held them up with a gun. Towl turned and ran to the door of the store, near the southwest corner of the building, and Anderson to the door next to it to the north. Bureca fired four shorts at Towl, one of which entered his back and came out of his body in the region of his pelvis. The bullet which struck him was from a 32-caliber automatic revolver. Bureca fired one or two shots after Towl reached the entrance of the store. Towl threw the sack of money in the aisle, fell to the floor, was taken to the hospital, and died from the wound on July 18, 1932. On the night in question electric lights illuminated the alley and parking space back of the store. The store, its four entrances and the display windows were also illuminated by electric lights. In addition there were street lights in front of the building where the robbery was attempted. There were lights at a filling station south of the alley, on Hazel street. Several automobiles were parked at an angle to the curb in front of the store, in Hazel street.

Joseph Tropea came from Chicago to Danville about three months before, and James Bureca says he came from Chicago about six days before the shooting, with friends who were on their way to LaSalle. The defendants had been acquainted some three or four years. They roomed together at the home of Alphonse DelValley in Batestown, about three and a half miles from the public square in Danville. DelValley says that he employed Bureca, who was an experienced coal miner, and that he was to take Tropea, who had no experience as a miner, with him to work in the mine. The testimony shows that neither of

the defendants had any tools or working clothes at the home of DelValley after the shooting. In their room were found a Panama hat, an Iver-Johnson revolver out of order, a mask, a sack containing 12-gauge shot-gun shells, 44, 38, 32 and 25-caliber cartridges, the last two numbers of which were for automatic pistols. A rod for cleaning a rifle was also found in their room.

In the afternoon of July 2, 1932, for more than an hour, the defendants were observed in front of a barber shop listening to a radio broadcast. Both the proprietor of the shop and his wife saw them there together and identified them, picking them out of a group of thirty-one men in the jail shortly before the second trial. They later identified them at the second trial as the men they had observed on the afternoon of the day of the shooting of Towl. In addition to George Conner and Angeline Conner, his wife, who were in the front part of the barber shop, Harry Galey, a farmer who had a stall at the city market, identified Tropea, and stated that he had seen him about 3:00 o'clock in the afternoon of July 2, 1932, walking through the city market. Mrs. Mona Waite was waiting in one of the automobiles in front of the Sears-Roebuck store at the time Towl was shot. She testified that she had observed both the defendants, whom she identified, walking up and down with Alfred DelValley in front of the store, eating bananas and looking into the store from time to time. This witness said she was looking at another car which was pulling up from the north when the shooting took place, but that when she looked back she saw Bureca running towards the north and that he glanced into the store. She did not see Tropea after the shooting. Mrs. Letitia Williams saw both the defendants together with a man she could not see clearly, and a fourth man whom she later identified as Alphonse DelValley, when she walked through the alley back of the Sears-Roebuck store shortly before the shooting. After the shooting, Smith Waite,

the husband of Mona Waite, was coming along the alley south of the store building with their twin sons, from the drug store. He testified he there met the defendant Tropea running in his direction, and that, in fact, Tropea almost ran into him. Mrs. Waite was sitting in their automobile, which was parked on the west side of the store and to the north of the door at the southwest corner through which Towl re-entered the store. The other defendant, Bureca, as has been stated, ran north after the shooting. James Anderson, who was with Towl; Paul Davis, a customer buying fishing tackle in the store; John W. Vaness, who was standing on the edge of the sidewalk in front of his parked automobile somewhat north of the Waite car, and John Vaness, his nephew, who was working on their automobile, saw Bureca, and all identified him at the police station next morning as well as at the trial.

Alphonse DelValley, wearing horn-rimmed glasses and a derby hat, went to the restaurant of Mr. and Mrs. Williams after the second trial. He used a Jewish dialect and represented that he was a candy salesman named Mills who had sold candy to Mrs. Williams at a different location some five years before. He and two other men who were present made affidavits in support of the motion for a new trial to the effect that Mrs. Williams there said she recognized DelValley as Mills and remembered him, but she and her husband and Howard Thomas made counter-affidavits denying these claims. It is not important whether Mrs. Williams did or did not say she recognized DelValley as Mills the candy salesman, in view of the fact that both defendants were so thoroughly and completely identified as the men who were in the business district of Danville on the afternoon of July 2 and as the men who were running away from the scene of the shooting. Their own testimony was that they did not leave the home of Alphonse DelValley all that afternoon and night.

Alfred DelValley testified that he lived about 250 feet from the home of his brother, Alphonse, and that he observed the defendants at his brother's home from 7:00 o'clock until 10:00 o'clock the evening of July 2, 1932. The additional abstract filed by the People, defendant in error, shows that this witness admitted that at the first trial of the defendants he testified that on the night of July 2, 1932, he was listening to the broadcast of the Democratic National Convention between 8:00 and 10:00 o'clock and that the defendants were playing cards at the home of his brother during that time. At the second trial Martin Dougherty testified for the People. He stated that he was general superintendent of the Chicago Stadium, in which that convention was held; that the broadcasting ceased at 6:00 o'clock central standard time on that evening, and that all the broadcasting equipment and microphones were removed before he left the building at 6:30 central standard time, 7:30 P. M. Chicago daylight saving time. After he left the stadium he had dinner with Governor (now President) Roosevelt and his party in the gold room of the Congress Hotel and there was no speaking or broadcasting that night from the hotel, although the proceedings of the convention had been broadcast the evening of July 1, 1932.

The defense relied upon was that of an alibi—that is, that both defendants were at the home of Alphonse DelValley and that neither of them left there the afternoon or evening of July 2, 1932. At the first trial the defendant Bureca testified Alfred DelValley was the first to return from Danville, but at the second trial he changed this and said Alphonse DelValley was the first to return home from town. When he testified at the first trial he denied carrying a 32-caliber automatic pistol, but at the second trial he admitted having carried such a gun for twenty years. In addition to the defendants, Alphonse, Alfred and Frances DelValley testified for the defendants as to the

alibi, and Robert R. Bookwalter, one of their attorneys of record in this court, testified as to a conversation in which he said Mrs. Mona Waite stated that there was a third man about twenty-one or twenty-three years of age in front of the Sears-Roebuck store the night of the shooting. She was also supposed to have said that she would not recognize this man if she saw him.

Defendants' counsel admit that the defendants were arrested on the receipt of information given by one of the defendants' witnesses, Herman Bradshaw, a former police officer. Bradshaw denies giving information to the police officers, but both officer Jesse Cowan and officer Wash Smith contradict him as to the source of their information relative to the defendants, whom they arrested at the home of Alphonse DelValley.

The first contention of defendants' counsel is that the evidence is conflicting, uncertain and insufficient to establish the guilt of the defendants of the crime charged beyond a reasonable doubt, and that, therefore, the court erred in overruling the motions for a new trial and in arrest of judgment. We cannot agree with counsel in this contention. The evidence is conflicting as to the identity of the accused and the men who attempted to rob Towl and Anderson and whether the defendants were present on the night of July 2, 1932, or in Danville on that afternoon. But conflicting testimony does not warrant this court in substituting its opinion or judgment for the verdict and judgment of the jury and trial court where there is evidence fairly tending to support such verdict and judgment. *People* v. *Buzan*, 351 Ill. 610.

It is next urged that the verdict is the result of prejudice and passion, and, coupled with this, that the State's attorney made improper remarks throughout the trial and during his argument to the jury. A careful reading of the argument of the State's attorney which is shown in the abstract does not, in our opinion, bear out the contention of

counsel that these remarks constitute reversible error or that the verdict was the result of passion or prejudice.

In this connection counsel for the defendants argue that it was error for the State's attorney to refer to the fact that the wife of Herman Bradshaw did not appear and testify. There was no objection made to the statement with reference to her absence and her failure to testify when these remarks were made. As to the matters which were objected to, we do not consider the language used, when the context is considered, as error, and as to those remarks to which no objection was made we said in *McCann* v. *People*, 226 Ill. 562, at page 571: "It will be observed that the court made no ruling and no exceptions were taken as to any ruling of the court or the refusal of the court to rule. There is therefore no question as to the propriety of the remark of the State's attorney preserved for review in this court. 'A party litigant * * * can only complain where he has objected and obtained a ruling and excepted to it or excepted to a refusal of the court to act.'" In *People* v. *Falkovitch*, 280 Ill. 321, at page 331, where the State's attorney's remarks were not objected to at the time they were made and the remarks alleged to have been improperly made were called to the trial court's attention by affidavits in support of a motion for new trial, we said: "As there was no objection made to the remarks and no ruling by the court there is no action of the court to be reviewed.—*Mayes* v. *People*, 106 Ill. 306; *People* v. *Spira*, 264 id. 243."

Counsel are in error in the contention that the shotgun shells found in a stolen car a mile or more from the Alphonse DelValley home were introduced in evidence. The cartridges in the sack found in the defendants' room comprise all such exhibits offered.

Counsel are also in error in the statement that an objection was made to any exhibit being given to the jury when it retired to consider the case. It does not appear

that the jury took any exhibits with it, either in the abtract or the record, and there were no objections to some exhibits while only general objections were made to others. The revolver was not objected to, and in view of the facts in the case we do not consider the admission in evidence of the sack of cartridges, rifle-cleaning rod, hat, mask and other articles found in the room of the defendants, or a reference to the shells found in the stolen car, as being such error as would warrant us in reversing this case. The pictures of Bureca show that the Panama hat fit him. It was found in the defendants' room. The evidence as to what kind of hat he wore on the day of the shooting is conflicting. It is significant that when the hat was put on his head and his picture was taken he remarked that this same hat would convict him. What we have said of the other exhibits applies to the pictures. The admission of incompetent evidence will not warrant a reversal where the proof of guilt is as clear and convincing as it is in this case, and whether such incompetent evidence is a sufficient ground for a reversal depends on the facts in each case. *People* v. *Burger,* 259 Ill. 284.

Complaint is also made that the trial court improperly overruled objections to impeaching questions put to certain witnesses for the defendants. In each instance the witnesses were later shown to have made the statement about which the questions were asked. They denied having given the answers in question or having made the particular statement. The questions were proper and these objections were properly overruled.

We find no merit in the contention that certain of the instructions given were not based upon the evidence. We have examined all of the instructions complained of, and while some of them are loosely drawn, yet any imperfections such instructions contained were cured by other proper instructions. The instruction as to the credibility of witnesses did not single out the witnesses on either side

210

but applied equally to both the witnesses for the People and for the defendants. There is not, in our opinion, anything in the instructions to require a new trial.

From a consideration of the whole case we believe these defendants had a fair trial and that their guilt of the crime of murder charged against them is proved beyond a reasonable doubt.

Perceiving no error in the record which would warrant a reversal of the judgment of the trial court, the judgment is affirmed.

*Judgment affirmed.*