(No. 22063.— )

The People of the State of Illinois, Defendant in Error, *vs.* Anthony De Suno, Plaintiff in Error.

*Opinion filed December 22, 1933.*

Wm. Scott Stewart, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, and Grenville Beardsley, of counsel,) for the People.

Mr. Justice Shaw delivered the opinion of the court:

The plaintiff in error, Anthony De Suno, (hereinafter called the defendant,) was indicted in the criminal court of Cook county on March 20, 1932, together with Lawrence King and Jessie King, on a charge of burglary of

the store of the Cutler Shoe Company, a corporation, in Chicago. The defendant was tried alone before the court upon waiver of a jury, was convicted, and after the usual motions for a new trial and in arrest of judgment were overruled was sentenced to the penitentiary. His two co-defendants had forfeited their bail and absconded. This writ of error is sued out to review the judgment of the criminal court.

It is assigned and argued as error that the defendant was not proved guilty beyond all reasonable doubt, that the venue was not proved, that incompetent evidence was admitted, and that there was no proper proof of the corporate existence of the Cutler Shoe Company, alleged to have been the owner of the premises burglarized. In view of the first assignment of error it will be necessary to review the evidence.

Ruth Saperstein testified that she lived at 5050 Glenwood avenue, in Chicago, on March 20, 1932, which was Palm Sunday; that when she and her husband came home that evening and walked into the vestibule two men met them with guns and forced them into their apartment, where they were followed by a third man; that she was so excited she did not know which one told them to go into the living room; that her mother came to the door, thinking they had company, and that the men forced her in with the rest of them and told her to sit still and they would not hurt her. She further testified that the hold-up men turned on the lights in the living room and that one of them (King) pulled down the shades; that the defendant, De Suno, pointed the gun at her husband and told him he wanted the key to the door of the store and the combination of the safe, and that her husband gave them to him; that the defendant was in the apartment about ten minutes, and that he had on a gray coat and a gray fedora hat; that he left, the other two remaining there, and that King was pointing a gun at her husband all the time so

that he could not move; that the defendant came back in about an hour and a half and said, "Everything is O. K.; let's go;" and that before they left they disconnected the telephone. She also testified that she had seen the defendant in the Bridewell Hospital afterwards, and that all she had testified to had occurred in the city of Chicago, in the county of Cook and State of Illinois. She further testified that there were two men in the apartment besides De Suno, and that subsequently she saw one of them in the Hudson avenue police station. On cross-examination she testified that she had gone to the Bridewell Hospital with her husband and officer Kunde, detective Smith and a Mr. Pennington for the purpose of identifying the defendant. She admitted her husband told her that they were going for the purpose of identifying one of the men who had been out to their house, and further admitted that was the reason she had identified De Suno.

Mrs. Saperstein's mother, who was present during this interview in the home, was not called for the People. No reason was given for this failure to produce an important eye-witness of the hold-up.

Herman Saperstein, husband of the previous witness, testified that he was the floor manager of the store of the Cutler Shoe Company, located in the Palmer House, and recounted the occurrence testified to by his wife in somewhat greater detail. He also identified the defendant as one of the men who had come to the apartment, but testified that he wore a dark-blue or black overcoat. He gave in considerable detail the conversation at the apartment, and said that the defendant told him he had been following him for at least a month; that he could tell him his actions for that entire day, and that he then did tell him in detail his actions for that day and told him the correct and exact location of certain keys in a room in the office; that he had convinced witness that he knew what he was talking about, and that there was nothing else witness could

do but to give up the keys and the combination of the safe, which he did, giving the men the card on which the combination was written, because, as he said, he was too nervous to write it. He further testified that he later saw De Suno in a house at 7763 Wood street with officer Kunde; that after seeing the defendant at the above address he went back to the shoe store, completed his day's work and then went home, and at dinner told his wife that they had picked up one of the men who had come to their home and that they would like to have her come down and look at him. He testified that he told his wife that the man she was to see was one of the men who had been in their home. He further testified that from eight to ten employees of the shoe company had keys to the store in question and that three different employees had access to the safe. This witness further testified in the first instance that no one accompanied his wife and him to the Bridewell, but later stated that he was not positive but that Smith, Pennington or the policeman might have been with them. The testimony of the detective, Smith, as hereinafter stated, was that all of the parties met at the Palmer House and that they went to the Bridewell together for the purpose of identifying the defendant. The witness Saperstein was later recalled for further cross-examination, and stated that the defendant, when in the witness' home, said that he knew there was a large sum of money in the safe of the shoe company, and that he was after the combination of the safe so he could go down there and get it.

Harry D. Smith testified for the People that he was a detective employed by the Pinkerton Night Watch Service, patrolling a beat which included the location of the Cutler shoe store; that on the night of Palm Sunday he saw a man whom he identified as the defendant come out of the store at about 9:45 P. M. and that the man was accompanied by a lady, but he did not identify the lady; that he stopped and talked to the man coming out of the

store; that this man asked the witness if Saperstein had been down, and that he told him no; that the man coming out of the store locked the door and tried it; that the witness asked him if everything was O. K., and the man said, "Yes;" that the witness tried the door afterwards and then went on about his patrol duties. He testified positively that the man who came out of the store with the unidentified lady and with a bundle under his arm wore a tan fedora hat, tan overcoat, tan suit and tan shoes. He also went to the Bridewell for the purpose of identifying the defendant, and testified that he and the two Sapersteins and others met at the Palmer House for that purpose and went to the Bridewell together. Neither he nor any other witness picked the defendant from among other persons, each witness being presented to the defendant alone for the purpose of identifying him.

The testimony of the above three witnesses is the only evidence, either circumstantial or direct, which connects the defendant with the crime in question in any way. No proceeds of the burglary were traced to him nor to anyone connected with him, nor was he shown to have had any large sum of money.

In his own defense the defendant took the witness stand and gave a full and complete account of his movements on the Palm Sunday in question. He testified that he attended services at the Church of St. Mary of Mt. Carmel, Sixty-seventh and Hermitage avenue, with his wife; that about 7:30 or a quarter to 8:00 in the evening he went to his mother's house, where he met his sister and Joseph Scotti, a young man who was keeping company with one of his sisters; that with his sister and Scotti he went from there to a restaurant on Wentworth avenue run by his brother-in-law and sister, the sister being sick in bed; that they visited with his sick sister for a while and then came down to the restaurant, where the brother-in-law had some sandwiches and lunch for them and where they met another

friend by the name of Anthony Genino; that they spent the entire evening there, eating, visiting and playing cards, and that at his request Genino stayed until they were ready to go home so that he could take them home in his automobile. He denied *in toto* the charges of the prosecuting witnesses. He testified that he did not know where 5050 Glenwood avenue is and did not know any addresses on the North Side; that he was dressed in a black overcoat, a dark-blue suit and a cap; that he never wore any kind of a hat in his life, always wearing a cap, and that he never owned a tan overcoat and did not have any tan shoes. He further testified that on the 29th of March he was sick in bed when officer Kunde came in and asked him his name and went out again; that a half hour later another man came in by himself, who he later learned was Herman Saperstein; that Saperstein came to his bed-room, looked in and then went to the kitchen with Kunde, and that thereafter the police patrol came and took him to the Bridewell Hospital; that Saperstein did not say in his presence that he was the man who held him up; that he was visited later by Mrs. Saperstein at the Bridewell Hospital with Saperstein and Kunde; that they all walked to his bed, and as they walked away from the bed Mrs. Saperstein shook her head negatively; that the three of them went into a "huddle," as the witness put it, and then came back to the bed and Mrs. Saperstein then said, "Yes," and nodded her head up and down. This testimony was not denied by Mrs. Saperstein or by any of the other witnesses present. For his further defense the plaintiff in error produced five unimpeached witnesses who verified his alibi, three witnesses to his good reputation, and the testimony of his employer that he had worked for him in his meat market for seven or eight years and had never been off duty more than three weeks for various vacations in the entire time.

In addition to the foregoing evidence there was testimony concerning the corporate existence of the Cutler Shoe

Company and the ownership of the funds in question, in which it might be said there were serious omissions. There were also serious defects and omissions in the proof of venue, as no one testified that the Cutler shoe store was in Cook county, Illinois. Since these omissions are of such character as to be not likely to occur again upon another trial of this case we find it unnecessary to discuss them in detail.

In this state of the record it is apparent that the case is close upon its facts and therefore highly important that the record should be free from prejudicial error. In order to arrive at the conclusion of guilt it is necessary to believe that the identifications of the defendant are so definite and trustworthy as to prove him guilty beyond a reasonable doubt, and in order to do this it is necessary to entirely disregard the testimony of five or six unimpeached witnesses in addition to the testimony of the defendant himself. It is also necessary that no weight be given to the testimony of good character, and that the testimony of his employer, O'Brien, should be given little, if any, weight. It must be conceded that the testimony identifying the defendant is not of the most conclusive character. The circumstances shown by the record indicate clearly that the hold-up and burglary were carried out and planned by someone very familiar with the inside arrangements and general method of doing business in the Cutler shoe store. It is also clear from the testimony of Saperstein that whoever it was he talked with in his apartment at the time he gave up the keys and the combination had a very intimate knowledge of his movements and business, not only on the day of the burglary but also for a period of at least a month prior thereto. This is hardly consistent with the testimony of O'Brien that defendant had worked constantly for him for many years and had not been off more than three weeks during the entire time, on account of various vacations.

We have had frequent occasion to discuss the weight to be given testimony identifying a defendant in connection with a crime, and have particularly pointed out the dangers inherent in such identification when the witnesses are called for the express purpose of identifying some certain person as being the alleged criminal rather than permitted or required to pick a person out of a group. In *People* v. *Crane,* 302 Ill. 217, we used the following language, on page 223: "It will be seen that the identification of the defendant was an important issue in the case. None of the State's witnesses testified to ever having seen the defendant before, and where one under arrest is brought alone before persons who are present for the purpose of identifying an assailant and who know that the person arrested is to be brought before them for identification, it is not unlikely that such surrounding circumstances might influence one who seeks to identify an assailant. Certain it is that such an identification cannot be given the same weight and credibility as where the witness had picked out the assailant from a number of persons unknown to her. This fact, together with the denial of the defendant and the testimony of Mrs. Frizell and Mrs. Frisbie, which, if true, makes it impossible that the defendant should have been the guilty party, requires that the evidence concerning identification of the defendant should be carefully weighed and that the record should be free from prejudicial error."

While it is the rule in Illinois that the fact that one accused was not picked out of a group of persons by the victim but was presented to him separately does not render the evidence of identification incompetent but only affects its weight, (*People* v. *Reilly,* 348 Ill. 153,) it is nevertheless also true that such a method of identification is not the best method and is not always entirely fair to the accused. We held in *People* v. *Martin,* 304 Ill. 494, that identification should be made at a time when the accused

is in the company of others unknown to the persons doing the identifying, and that to notify witnesses to come to the police station to identify a person the police thought had committed the crime, and to have him brought alone into the presence of such witnesses, affected the weight to be given to the identifying testimony. In the case which we are now reviewing, Herman Saperstein testified that the man who was at his house had on a light or gray fedora hat and a dark-blue or black overcoat. His wife testified that he had on a gray overcoat. The detective, Smith, who was presumably a trained observer by reason of his occupation, testified that the man he saw coming from the shoe store had on a tan fedora hat, a tan overcoat, a tan suit and tan shoes. As against this, the defendant himself testified that he had never owned a hat in his life, having always worn a cap, and in this he was corroborated by his family and friends. He further testified that he had never had a tan suit, tan hat or tan overcoat.

Without determining the guilt or innocence of the defendant, we are constrained to hold that the record is such as to make it important that it should be free from prejudicial error; and this is especially true in view of the testimony as to good reputation and alibi which was introduced on behalf of the defendant and not controverted. It must be borne in mind that we are not at liberty to entirely disregard evidence of good reputation. While it is not proof of innocence, it may be sufficient to raise a reasonable doubt as to the defendant's guilt. (*People* v. *Koloski,* 309 Ill. 468.) We may safely assume that this evidence would have been controverted if the defendant had any criminal record in Chicago, and since it stands uncontroverted it must be given some consideration and weight. This is also true as to the defense of alibi. When this defense is clearly established it has been held by us to be conclusive of the innocence of the defendant. (*People* v. *Blair,* 266 Ill. 70.) In this case the defendant was corroborated in

his testimony as to his movements on the Palm Sunday in question by four unimpeached witnesses, as against which the only argument advanced is that they were mostly relatives. It is true that one was his sister and one was a brother-in-law, but Joseph Scotti was not related to him, being only a companion of his sister, and Anthony Genino a mere acquaintance. It cannot be said that the circumstances in this case are such as to discredit their testimony, and it should be noted that it is quite ordinary for any person to be with the members of his own family on Palm Sunday, Easter, Christmas or any holiday, and therefore, in case of need, necessarily dependent upon their testimony as to his whereabouts.

The police officer, Arthur Kunde, was permitted to testify that while he was in the apartment of Mrs. King there was a rap at the door and that the defendant came to the door with a package of meat, he being the delivery boy for the O'Brien market, and that Mrs. King went to the door and put her fingers to her mouth. When this statement was made the attorney for the defendant objected and moved to strike the evidence. Upon the statement of the State's attorney that the defendant was present at the time, the motion was overruled and the evidence was held competent. It is argued by the People in their brief on file herein that it was competent upon the theory that Mrs. King was a co-conspirator. They state that watches taken from the safe of the Cutler shoe store were found on her person without any explanation for her possession thereof, and that it was, to quote from their brief, "fair to assume that she was one of the burglars and was acting in concert with De Suno. The cirmumstances showed that she was the woman who came out of Cutler's place with De Suno." The carelessness of the State's attorney in the presentation of this argument has caused us a great deal of unnecessary labor. We have searched the original record page by page and find that there is no scintilla of evidence to support it.

The witness was permitted to continue to discuss the matter of watches, and it finally appeared that some matron at the police station had told the witness that she had found some watches on the person of Mrs. King. There was, however, no evidence of any kind, either hearsay or otherwise, to indicate that the watches found on Mrs. King, if any were found, were in any way connected with this burglary. There is no evidence of any kind in the record to connect the defendant on trial with Mrs. King, other than the fact that he delivered a package of meat to her, and this package, when opened by the policeman, was found to actually contain meat. The detective who testified to seeing a woman coming from the Cutler store did not identify her as Mrs. King, and there is no basis in the record for the unwarranted statement in the brief for the defendant in error that she was the person who came out of the Cutler store. There being an entire failure to show any connection at all between the defendant and Mrs. King it was clearly incompetent to permit testimony as to what she said or did as having any effect upon the defendant in this case. It was furthermore clearly incompetent to permit the witness to testify, upon hearsay, that some watches had been found upon Mrs. King's person by a matron at the police station. The matron was not called, nor was there any effort to identify the watches or connect them with this burglary. After this testimony was all in about the watches being found by the matron the trial judge ordered it stricken from the record, but it is not by any means certain that he was able to strike the effect of it from his mind. The error was clearly prejudicial and in our opinion sufficient to warrant a reversal upon a close case.

Upon the whole record we are of the opinion that the ends of justice will be better served if this judgment is reversed and the cause remanded for a new trial, and it is so ordered.

*Reversed and remanded.*