(No. 22728.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HAROLD PECK, Plaintiff in Error.

*Opinion filed December 19, 1934.*

ACTON, ACTON & BALDWIN, (W. M. ACTON, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, OLIVER D. MANN, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The plaintiff in error (hereinafter called the defendant) was, together with three other men, indicted by the grand jury of Vermilion county at the October term, 1933, charged with robbery from the person of John W. Joiner while armed with a deadly weapon. He was tried separately from the others charged in the same indictment. He was found guilty and sentenced to the penitentiary and has sued out a writ of error from this court to review the judgment of conviction against him.

The defendant assigns as error that the evidence failed to establish his guilt beyond a reasonable doubt and that certain instructions given to the jury were erroneous. Counsel representing the defendant here did not represent him in the trial court. No exception is preserved by the

bill of exceptions to the giving of the instructions charged to be erroneous. We therefore cannot review the action of the trial court in giving the instructions against which complaint is made. *People* v. *Bureca,* 355 Ill. 202.

The cause has been tried three times in the circuit court of Vermilion county. The juries in the first two trials failed to agree and were discharged.

The prosecuting witness, Joiner, is the only witness who testified for the People. The record shows that he lived about two miles east of Oakwood, in Vermilion county. On the night of August 13, 1933, he drove to his home in his automobile, arriving between 8:45 and 9:15 o'clock. He testified that when he started to close the garage doors after driving his automobile into the garage and turning off the lights, three men suddenly appeared. One man, who he says is the defendant, held a revolver in his hand and also had a small flash-light. Joiner says the men were masked, and that Peck's mask extended upwards to about half of his nose. He says he was pushed backwards, told by the defendant that it was a hold-up and asked where he had his money, to which Joiner replied that he did not have any money except what he had in his pockets; that after searching him thoroughly, even to the examination of his trouser cuffs and examining his person in quest of a money belt, his hands were then tied behind his back. He further testified in chief that he was taken into the house and there blindfolded, although on cross-examination he admitted that in this statement he was mistaken and that he was blindfolded at the garage and not after he went into the house. The robbers searched the house for loot and remained in the house for some time. Joiner, still blindfolded, was placed on his bed, his hands and feet were tied and a gag was placed in his mouth. He says the defendant remained for some few minutes after the others left. Joiner was robbed of his watch and $20 in money. The watch was hanging on a wall in the house,

from which place it was taken. He testified that there was no moon at that hour of the night and that it was a dark night. He stated that he had never seen Peck before that night; that the flash-light was never turned on the man claimed to be Peck, but he, Joiner, could see him by reason of the reflection of the rays of the flashlight from the body of the prosecuting witness. The record does not state whether the man claimed to be the defendant had on any hat or cap at the time of the robbery. Joiner testified that Peck wore a soiled green shirt similar to the one that he wore at the time of the last trial. Joiner testified on cross-examination that he identified Peck because of his peculiar nose. When asked whether he gave any description of the robbers when reporting the robbery to the sheriff, he said that he did not know. The record shows that at the time of the first trial the then attorney for the defendant had a conversation with Joiner before the trial started, in which the defendant's then attorney asked Joiner if he would look around the court room and identify Peck, and that Joiner then said the only way he could identify Peck was to stand within twelve or fourteen inches of his face and take a look at him; that shortly thereafter the sheriff came in, took Joiner over to where Peck was sitting in the prisoners' dock and told Joiner that the man there was Peck and to go and take a look at him and see if he could identify him.

The defendant testified in his own behalf. He stated that he had never seen Joiner in his lifetime until the first trial. He denied all complicity in or knowledge of the robbery and denied that he was at the home of the prosecuting witness, or in the neighborhood of Oakwood, on the night of the robbery. He stated that he and his wife were not living together; that he had brought his children down from Chicago the day before August 13 and that they were staying at the home of a young lady named Millie Haines, in Danville; that on the afternoon of August 13 he went to

the Haines home; that at that time a Mrs. Nichols and a Mrs. Royce were there; that they all had dinner at the Haines home; that he went up-town about 5:00 o'clock, was gone about an hour and returned to the apartment and stayed until about 8:30 or 8:45 P. M.; that during all that time the three ladies mentioned above were there; that he escorted Mrs. Royce to her home, a short distance away; that after accompanying Mrs. Royce to her home he returned immediately to the Haines home; that the time occupied by him in escorting Mrs. Royce and returning to the Haines home did not exceed fifteen or twenty minutes; that he remained at the Haines home until about 11:30 that night, and that during all that time, from the time he returned, Mrs. Nichols and Miss Haines were at the apartment, and that when he left the Haines home, at about 11:30 P. M., he went to the place where he was rooming, on Jackson street, and stayed there all night.

The testimony of the defendant as to his whereabouts, the time when and with whom he left the apartment and the time of his absence on the evening and night of August 13 is fully corroborated by the evidence of Mrs. Nichols and Miss Haines. Mrs. Royce also corroborated the defendant as to the fact of his being at the Haines apartment; that he escorted Mrs. Royce to her home; the time when she and the defendant left the Haines apartment, and that he immediately left Mrs. Royce after escorting her to her home.

Herman Bott, a business man of twenty-two years' experience in Danville, who had been acquainted with Peck for fifteen years; Mrs. Miller, a business woman who had lived in Danville for thirty-five years, had been in the jewelry business for herself for twenty years and had known Peck as long as she could remember; and Carl Kienast, who had been in business for himself in Danville for twenty-eight years, his place of business being next to the Central Theatre, of which Peck was formerly the

manager, and who had an acquaintance with Peck for ten years, testified for the defendant. The three witnesses last named testified that they were acquainted with Peck's general reputation as a peaceable and law-abiding citizen among his neighbors, friends and associates prior to August 13, 1933, and that that reputation was good. On cross-examination they testified that they did not know his associates since he quit managing the theatre, in 1929.

There are some discrepancies between the testimony of the defendant and his alibi witnesses, but those discrepancies are upon immaterial matters and there is no conflict in the testimony as to the material matters related by the witnesses called for the purpose of establishing the alibi of the defendant.

It was stipulated by the defendant's counsel and the State's attorney that at the trial in January, 1934, the defendant was asked the question, "Where were you on August 13, 1933?" and he answered, "I can't say at this time." The defendant testified in explanation of such answer that the State's attorney had asked him ten or twelve dates real fast, as to where he was on those different dates.

There is no evidence in the record that the defendant did not at the trials in November and January relate the same set of circumstances as to his whereabouts on the evening and night of August 13, 1933, as he did at the present trial. The State's attorney would assuredly have proved any variance in the defendant's testimony upon that issue if there was a material departure from or a material supplement to his evidence as given on either of the preceding trials. No evidence was offered by the People to contradict the evidence of the reputation witnesses who testified for the defendant, nor was any evidence offered by way of impeachment of any of the witnesses who testified with reference to the subject of the alibi of the defendant. The prosecuting witness does not claim ever to

have recognized or identified the defendant until the day of the first trial, in October, 1933.

We have endeavored to state the material parts of the testimony as shown in the record. The conviction of the defendant rests wholly upon the identification of him made by the prosecuting witness. Two juries have failed to agree upon whether the defendant was sufficiently identified as one of the robbers. There is no evidence in the record of any scar upon or anything peculiar or abnormal about the nose of the defendant. No marks of identification are described by the prosecuting witness other than the mention of the nose. In this connection we must also remember that the robber's face was covered by a mask extending upwards to the upper half of the nose. At the trial the prosecuting witness did not purport to recognize the sound of the robber's voice as one of the means of identification, although according to the evidence the robber who held the flash-light was the spokesman for the quartet and did considerable talking in the presence and hearing of the prosecuting witness. Apparently no effort was ever made after the arrest of the defendant and prior to the trial in November, 1933, to have the prosecuting witness identify the defendant in a line-up or pick him out from a group of men. Joiner testified that his eyesight is normal. The circumstance of his uncontradicted statement made in the court room, just before the commencement of the first trial, of his inability to identify the man unless within twelve or fourteen inches of him; the circumstances under which the defendant was pointed out in the court room by the sheriff as Peck, and the manner of recognizing a masked man on a dark night by the reflected rays of a small flash-light pointed not towards the robber but towards the person of Joiner, the flash-light being held in the hands of the robber, make the possibility of an accurate and dependable identification doubtful. While we do not question the good faith of the prosecuting witness in

his identification of the defendant as one of the robbers, yet we believe the circumstances, when considered together, tend to impair the weight to be given to the evidence of identification of the defendant. In weighing the evidence of identification of one stranger by another, the attendant circumstances, together with the probability or improbability of affording an opportunity for a definite identification, must be considered and weighed, for, after all, the identification of one person by another who has never seen him before is an opinion or conclusion of the identifying witness. *People* v. *Fiorita,* 339 Ill. 78.

The burden was on the People not only to prove, beyond a reasonable doubt, the commission of the crime charged, but the People were further required to prove to the same degree that the defendant was one of the persons who committed the offense. (*People* v. *Cramer,* 298 Ill. 509; *People* v. *Fiorita, supra.*) In the review of a case in which it is urged that the defendant's guilt has not been proved beyond a reasonable doubt we are not at liberty to shut our minds to uncontradicted evidence of good reputation, neither can we disregard the evidence of alibi where the only evidence contradicting it rests upon the identity of the defendant as one of the perpetrators of the offense charged. (*People* v. *DeSuno,* 354 Ill. 387.) Where from the entire record there is a reasonable doubt of the guilt of the defendant a judgment of conviction cannot be permitted to stand. *People* v. *Burr,* 356 Ill. 452; *People* v. *McPheron,* 354 id. 381; *People* v. *Steinbuch,* 306 id. 441.

In the consideration of this cause we have accorded to the verdict of the jury, and to the judgment of the trial court thereon, the full benefit of their seeing and hearing the witnesses testify and of observing their conduct and demeanor while testifying, yet we cannot say the record in the cause is sufficient to justify the belief that the defendant's guilt has been proved beyond a reasonable doubt. Inasmuch as the case has been three times tried in the cir-

cuit court and obviously the People can produce no further evidence bearing on the defendant's guilt, no useful purpose would be served by remanding the cause for another trial.

The judgment of the circuit court is reversed.

*Judgment reversed.*