(No. 22950.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH GOLD, Plaintiff in Error.

*Opinion filed June 14, 1935.*

ODE L. RANKIN, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Joseph Gold was convicted in the criminal court of Cook county of the larceny of a sewing machine of the value of $120 belonging to the Singer Sewing Machine Company. The trial was by jury and the cause is here on writ of error.

The ground relied upon for reversal is that the defense of alibi and good character outweighed the testimony of the People identifying defendant as the thief.

Harry Levitus, manager of a branch office of the Singer Sewing Machine Company in the west part of Chicago, testified that about 11:15 o'clock A. M. on Saturday, February 3, 1934, he parked his car across the street from another branch of the company on Marion street, in Oak Park, and went across to the office to get the pay-roll for his men. The Oak Park branch is on the east side of the street and directly across from an alley running west from Marion street to Harlem avenue. The store is on the first floor and has a plate-glass front. Marion street is about

fifty-five feet wide. South of the alley, and just off the sidewalk, is an incline leading to an elevator in the rear of the Fair store. Levitus parked his car on the incline. It was headed west, with the rear end in front of the Singer Sewing Machine Company office. The car was equipped with a trunk on the rear for carrying a sewing machine. One was in it at this time. About fifteen minutes after Levitus entered the office, he and Oscar B. Lipsitz, an employee of the credit department, were in the front of the store and saw a man taking the sewing machine out of the trunk on the back of the car. They ran out of the store and across the street in an effort to intercept the thief. Before they could reach him the man placed the machine in the rumble seat of a brown coupe. The car was headed west in the alley and was driven by another party. The thief jumped on the right-hand running-board of the car and they drove west through the alley, turned north on Harlem avenue and escaped. Meanwhile the thief got into the car from the running-board.

Levitus testified that while he was in pursuit he shouted "Stop Thief!" when he was about twenty-five feet away from the man who was taking the machine from the automobile; that the man glanced around and Levitus saw his eyes, nose and mouth; that the pursuit was momentarily interfered with by an automobile which was proceeding south on Marion street; that he could not see the thief's car behind a small building until he got within ten feet of the man as he was putting the machine in the rumble seat; that the man had on a fedora hat and a tan overcoat, was five feet six or seven inches tall, weighed from 155 to 160 pounds and had a pugilistic nose and a sandy complexion; that he did not notice his ears nor remember the color of the hat, and that defendant was the man who took the machine.

Lipsitz testified he looked through the window of the company office and saw a man taking the machine out of

the trunk on the Levitus car across the street and got a good look at him. The man had on a dark felt hat and a dark overcoat that looked brown. It was not black. He had a pugilistic nose and deformed features, with ears close to the head. He was about five feet seven and one-half inches tall, weighed about 165 pounds and was thirty-two or thirty-three years of age. The witness ran across the street behind Levitus and got within thirty feet of the thief. He testified the machine was stolen about 11:30 o'clock A. M. and that defendant was the man who took it.

The testimony of Levitus and Lipsitz is the only testimony tending to connect defendant with the crime. It was stipulated that his age is twenty-six years.

Robert E. Dunne, an attorney at law associated with the attorney who defended Gold in the trial court, testified that as an investigator he interviewed Lipsitz in September, 1934; that he asked Lipsitz what left an impression of the man on his mind, and Lipsitz told him the man he saw taking the machine had cauliflower ears and a flat nose; that these features impressed him because he had been connected with the pugilistic game; that at the time of the occurrence he was outside the door with two other employees going to lunch, and that the man he saw taking the machine wore a cap and a brown overcoat. In rebuttal, Lipsitz testified that Dunne did not ask him what impressed him as to the identity of defendant, and he did not say that defendant had cauliflower ears and a pug nose, nor that the man who took the machine wore a cap.

Alexander Inglis, a police officer of Oak Park, testified that on the day of the theft Levitus told him the man who took the machine weighed about 170 pounds, wore a dark overcoat with a fur collar, and a brown hat; that the car into which the machine was put had an Antioch, Illinois, sticker on the wind-shield. A typewritten police report made by Inglis on the day of the occurrence after his interview with Levitus, showing the facts to which he testified,

was admitted in evidence without objection. Levitus denied telling him that the man had on a dark overcoat with a fur collar and denied saying that the thief's car had an Antioch sticker on the wind-shield. He testified that he told him the man had on a tan overcoat.

Defendant resided at 1503 South Millard avenue, in Chicago, with his grandmother, his aunt and uncle. He last worked as a painter. He denied categorically that he was near the vicinity of the theft, denied taking any machine out of a car, placing it in another car and getting into the latter car, and denied having anything to do with or knowledge of the theft. He testified that on the morning of February 3 he went over to his mother's house, at 1516 South Ridgway avenue, and found his mother, his sister, (Stella Harris,) and her girl friend, Fanny Goldberg, there. At his sister's direction he took her fur coat and a fox collar to the Solomon Fur Company, in the State-Lake building, at 190 North State street. He left the house about 9:30 o'clock A. M. and reached Solomon's place about 10:00 o'clock. He was not acquainted with Solomon but introduced himself as Mrs. Harris' brother. Solomon recognized the coat. It being Saturday, none of Solomon's employees were there and he did not want to repair the coat that day. Defendant insisted, because it was his sister's birthday and she wanted to use it that afternoon. Solomon agreed to repair the coat and it took about two hours to do it. Defendant received a receipt for the fox collar left in storage and later gave it to his sister. He left Solomon's place with the coat about a quarter of 12:00 o'clock and went over to a luggage store at 222 South Wabash avenue, intending to buy a grip for a birthday present to his sister. He got there about 12:15 and talked with Miss Laura Exelman, a clerk and a friend of his sister. She was the only one in the store at that time. She told him she intended to give his sister a grip and advised him not to buy one but to give her cash. From the luggage store

he went straight home, arriving about 1:45 o'clock. As soon as he got there his sister put the coat on and left with Mrs. Goldberg, returning about 6:00 o'clock P. M. Miss Exelman came out to dinner that evening. He remained there until about 1:00 o'clock that night. He had on a blue suit and a double-breasted blue overcoat that day. It had a half belt in the back and an ordinary collar. He wore a real light-tan soft hat. About two years prior to February 3, 1934, a part of his right knee-cap was removed as the result of an automobile accident. After the operation he walked with a limp and was unable to throw his weight on his right side. He never was convicted of any violation of the law and had never been arrested before.

Maurice Solomon, the furrier, has his place of business in the State-Lake building, at 190 North State street, Chicago. He testified he had known Stella Harris five or six years. About 10:00 o'clock in the morning of February 3, 1934, defendant brought her fur coat and a fox collar to his place of business to have the coat repaired and the fox collar cleaned and stored. He was not acquainted with defendant but recognized the coat because he had taken care of it for Mrs. Harris about five years. None of his employees were there, but defendant insisted on the coat being repaired as Mrs. Harris was going to a party or something. It took about an hour and a half to make the repairs. He gave defendant a receipt for the fur collar and defendant left about 11:30 or 11:45 o'clock. The price of the cleaning was one dollar and the same price for storage. Defendant did not pay for the repair and he made no charge. He did not get Mrs. Harris' work the first year he was in business and made the repair as an advertisement. Some time before the trial Mrs. Harris asked him if he remembered when her brother was there, and he examined his records. She gave him the original receipt for the collar, and he had it in court the day previously but could not find it. A duplicate carbon copy

from his records bearing his signature and dated February 3, 1934, was introduced in evidence.

Stella Harris, defendant's sister, corroborated his testimony about sending the furs to Solomon. He returned about 1:30 or 1:45 o'clock P. M. with the coat and a receipt for the fox fur and gave her the receipt. She last saw the receipt at the Oak Park station and thought it had been given to Solomon. Her friend, Fannie Goldberg, stayed all night with her the previous night. They were in bed when defendant arrived in the morning and he took the coat and fox fur from a closet in their bed-room. About 11:30 in the morning she received a telegram from her uncle and aunt on Ridgway avenue congratulating her upon her birthday. The telegram was admitted in evidence That afternoon she and Mrs. Goldberg left the house about 2:00 o'clock. They went down-town, had lunch at the Oriental Gardens, looked around the stores, and returned home about 6:00 o'clock. Her mother and defendant were there. About 6:30 or 6:45 Miss Laura Exelman came and they all had dinner together. Fannie Goldberg left about 9:00 or 9:30. Miss Exelman left about an hour before that. Defendant left about 1:00 o'clock the following morning. Fannie Goldberg corroborated Mrs. Harris in detail as to the transactions on that day.

Laura Exelman, an employee of a luggage shop at 222 South Wabash avenue, corroborated defendant's testimony as to his visit to the shop. She testified that he came in about 12:25 or 12:30 o'clock, during the lunch hour. He said he wanted to purchase a gift for his sister and mentioned a brown leather suit-case. She told him she did not think it was necessary because that was what she was giving her and that his sister could use the money to better advantage. She noticed he had a package and asked him if he had bought a new coat or suit. He said "no;" that it was his sister's coat; that he had brought it from Solomon's, where he waited two hours while it was being re-

paired. He was wearing a light-tan hat at that time and a blue-black overcoat. He left the store about 1:00 o'clock or a few minutes after. They talked about her coming out to dinner, and she had dinner that night at the home of Mrs. Harris' mother. Fannie Goldberg and defendant were there. She left about a quarter of 9:00 o'clock. Mrs. Goldberg and the others were still there.

Dr. Samuel H. Kuznesky, a dentist, and Max Rubenstein, engaged in the business of cleaning and dyeing, testified to defendant's good reputation for honesty and being a law-abiding citizen. They knew him sixteen and twelve years, respectively.

If the testimony of Solomon and Miss Exelman is true, it is impossible that defendant was at the scene of the crime when it was committed, approximately ten miles from where they located him from 10:00 o'clock in the morning until 12:30 P. M. Their testimony does not bear any marks of improbability. Defendant's whereabouts from 9:30 in the morning until 1:00 o'clock A. M. the following day were accounted for. A plausible reason for the fixing of the particular day appears from the fact that it was the birthday of Mrs. Harris. The telegram of congratulations supports this testimony. Three of the alibi witnesses were not related to defendant.

It is apparent that Levitus and Lipsitz had no opportunity to study or register more than fleeting impressions of the thief's face. Lipsitz saw his face through the window from across the street and did not see it again. The thief was running, with his back toward him, as Lipsitz ran across the street, following Levitus. The only time that Levitus saw the face of the thief was when he shouted "Stop Thief!" before he was interfered with by a car driving south. He saw it only for an instant and was greatly excited. Neither of the witnesses for the People testified to any peculiarity or limp in the gait of the thief. He ran down some steps with the machine, weighing from sixty-

five to seventy-five pounds, to the car in which it was placed. The testimony of officer Inglis as to the statements of Levitus immediately after the theft differs materially from his testimony on the trial. It is apparent that, no matter how honest Levitus and Lipsitz were in their effort to identify defendant as the thief, the circumstances offered great opportunity for mistake. No man should be deprived of his liberty unless his identification as the party charged with a crime is under such circumstances and with such positiveness that there can be no reasonable doubt of its correctness.

In order to set aside a verdict of a jury in a criminal case where the record contains no error of law, it is necessary that this court be convinced that the verdict is contrary to the weight of the evidence. (*People* v. *Martin,* 304 Ill. 494.) Defendant was a stranger to both of the identifying witnesses. In weighing such evidence, the attendant circumstances, together with the probability or improbability of an adequate opportunity for a definite identification, must be considered and weighed. An identification made by a stranger without a sufficient opportunity to definitely fix features or characteristics must be an opinion or conclusion of the identifying witness. The burden was on the People not only to prove, beyond a reasonable doubt, the commission of the crime charged, but they were further required to prove in the same degree that defendant was the person who committed it. (*People* v. *Peck,* 358 Ill. 642; *People* v. *Fiorita,* 339 id. 78.) Where the conviction of a defendant rests upon an identification which is doubtful, vague or uncertain and which does not produce an abiding conviction of guilt to a moral certainty it should be reversed. (*People* v. *Fiorita, supra; People* v. *Steinbuch,* 306 Ill. 441; *People* v. *Cramer,* 298 id. 509.) While evidence of good reputation is not proof of innocence, it is not to be disregarded, and it may be sufficient to raise a reasonable doubt as to defendant's guilt. (*People* v. *De-*

*Suno,* 354 Ill. 387; *People* v. *Koloski,* 309 id. 468.) In this case defendant's good reputation stands uncontroverted and must be given some consideration and weight. (*People* v. *Peck, supra.*) Neither can we disregard the evidence of alibi where the only evidence contradicting it rests upon the identity of defendant as the man who took the machine. (*People* v. *Peck, supra; People* v. *DeSuno, supra.*) While the identification and whereabouts of defendant at the time the crime was committed are questions for the jury, yet where from the entire record there is reasonable doubt of the guilt of defendant a judgment of conviction cannot be permitted to stand. *People* v. *Burr,* 356 Ill. 452; *People* v. *McPheron,* 354 id. 381; *People* v. *Steinbuch, supra.*

Upon a consideration of the whole record we are of the opinion that the testimony does not show defendant's guilt beyond a reasonable doubt and that the verdict is contrary to the weight of the evidence. The judgment is therefore reversed and the cause is remanded to the criminal court for a new trial.    *Reversed and remanded.*