The People of the State of Illinois, Defendant in Error, v. Arthur Gardner, Plaintiff in Error.

Gen. No. 49,879.

First District, Fourth Division.

June 30, 1965.

Adams, Weston, Barnes & Grant, of Chicago (George C. Adams, of counsel), for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from a conviction, by a jury, of the crime of forcible rape for which he was sentenced to a minimum of one year and a maximum of ten years in the penitentiary.

Defendant argues that he was not proven guilty beyond a reasonable doubt; that certain instructions were erroneously refused; that comments by the State's Attorney in closing argument were prejudicial; and that the court erred in overruling defendant's motion for new trial.

People's witness Helen L. Davis testified that on September 15, 1963, she occupied a second floor apartment at 6028A South Blackstone Avenue in Chicago; that about ten o'clock of that evening she went to the back porch door and locked it; that she returned to her apartment; that the bedroom window was about 33 inches wide; that the window had "sheer curtains"; that the shade was "partly down"; that the window was open "about three-fourths of the way"; and that there was a screen which was nailed to the window frame. She further testified that she locked her apartment door and left a 150 watt light on in her kitchen; that she entered her bedroom and completely undressed and put on a gown and housecoat. She testified that she went back to her kitchen to listen to the "last two records" on her phonograph; that while there:

> Well, I heard a swishing noise, but I knew that I was in the house and I had the door locked . . . I took it for granted, it was the wind blowing the curtains at the window. The next thing I knows, I heard a footstep. And when I heard the step, I automatically turned around and jumps up and I looked right in the man's face. And, when I did,

329

he grabs me around the throat with both his hands.

She testified that defendant said "Don't scream" and admonished her not to look at him; that he kept one hand on her throat while he had intercourse with her which lasted "about two or three minutes"; that he apparently had a climax because "I was extremely wet." She testified that defendant left her apartment by the kitchen door; that she "jumped up" after she heard him unlock the hall door. The witness testified that she went to the porch door; that neighbors joined her there; that a neighbor called the police and that she told the assembling neighbors about the incident. She testified that:

They wanted to know what was the commotion. I guess I must have been hollering, or something, you know, and I was saying what happened, meanwhile, what the noise was all about.

She further testified that she was able to observe defendant's attire during the carnal act. She testified that:

He had on these kind of big shoes like boot shoes. In other words, they're brogans, or something like that. And, then, he had on some kind of bluish green pants or greenish blue pants, light, work, washable pants, and he had on a white shirt . . . and a kind of bluish greenish looking sweater.

She testified that defendant has "long sideburns" and "a little slur" in his voice. She further testified that she identified the defendant at Billings Hospital the following morning; that she recognized the voice; and that there was no question in her mind that it was the same man who had raped her.

On cross-examination she testified that defendant removed his left hand from her neck because "I guess

330

he take his penis out of his pants with it"; that she did not have any "gentlemen company" around the day or night of the incident; that she did not hear the window screens being pried loose because "my two neighbors and myself was sitting in the kitchen playing my record player"; that she told the police that defendant "weighed around 200 pounds. He was six feet tall, he had to be, because he take up my whole doorway," and that defendant was in her apartment "approximately fifteen minutes."

People's witness Chicago Police Officer John Jackson testified that he arrived at the Davis apartment at about 11:15 p. m.; that he had "had the call as a burglary. But, when I interviewed the victim she said she was a rape victim." He asked her for a description which he then had broadcasted to police vehicles. On cross-examination he read the description from a report that he had made to the Police Department and which had subsequently been transcribed. The description: "One male Negro, between the age of 29 and 30, six feet one inch tall, 160 pounds, light complexion, black short hair, wore blue shirt and blue fatigue pants." On redirect examination Jackson testified that Mrs. Davis' "appearance was [that] she was emotionally upset and hysterical."

People's witness Police Officer DeArmand Carter testified that on September 15, 1963, at approximately eleven o'clock he heard a description of an alleged rapist on the police radio; that he stopped defendant at 60th Street and University Avenue (about four and one-half blocks from the Davis apartment) at about 11:15 p. m. He testified that defendant was walking east toward Blackstone; that when he stopped him the defendant "was sweating very profusely" and that he "seemed to have been running or walking very fast." In response to Officer Carter's questioning defendant said that he had been at the Regal Theater

331

(47th Street and South Park Avenue); that he was proceeding on foot to his home at 7339 Kimbark; that he could not recall the name of the movie; and that he had not been with or seen anyone he knew at or in the vicinity of the theater. The officer testified that he conducted a search for narcotics on the defendant; that he uncovered $129 in currency and one ticket stub (Defendant's Exhibit No. 2) without a date or name on it. He testified that he took the defendant to Billings Hospital where Helen Davis was being examined; that she stated: "This is the man. This is the man that raped me"; that defendant "didn't say anything, he dropped his head." On cross-examination he testified that defendant "didn't have an impediment of speech" and that he did not observe a "retarded condition."

Chicago Police Detective Jack Wallenda testified that he arrived at the apartment about 12:45 a. m. September 16, 1963; that he unsuccessfully dusted the room and entrances for finger prints; that he saw the defendant afterwards; that he estimated defendant's weight at "approximately 225, 230"; and that he was "very light" complexioned.

It was stipulated by both parties that an analysis of liquid taken from Mrs. Davis' privates on September 16, 1963, at the hospital disclosed the existence of "live sperm."

Defendant Arthur Gardner (twenty-eight years old in 1963) testified that on September 15, 1963, he went to the Regal Theater about 4:30 p. m.; that he proceeded to the Metropolitan Theater "between seven-thirty and eight o'clock"; that he saw two pictures (The Balcony and The Trunk) at the Metropolitan and that he left there at about 11:00 p. m.; that he walked to the corner of 47th and South Park where he met Mr. Solomon Clark. Defendant testified that Clark did not remember that defendant had been Clark's newspaper

boy in 1950; that defendant told Clark that he lived at 7339 Kimbark and that "my mother is buying the place there"; that Clark gave him a card and said "If you ever need any help in real estate, call on me." Defendant further testified that he walked to 60th Street and University Avenue where he was "picked up" by the police and taken to (Billings) Hospital; that he was taken into a room where "As soon as I got in the door real good, she (Davis) say, 'That's him,' to the officer." The defendant denied ever being at or knowing of a building at 6028 Blackstone; that the only times he saw Davis were at the hospital and subsequently at a police station; that on September 15, 1963, he weighed 265 pounds and was wearing "dark blue pants, a white shirt and a black and white, black and yellow sweater." On cross-examination he testified that he was wearing "big . . . Army boots"; that he went to movies every Sunday in the 47th and South Park area, that Mr. Clark gave him two cards; that he placed both in his "folder wallet"; but the police search did not uncover them; that he gave the police officer a ticket stub from the Metropolitan Theater (Defendant's Exhibit No. 2); that he kept the other ticket "in my watch pocket"; and that he "just saves tickets."

Defendant presented four other witnesses.

Lonnie Lewis, manager of the Metropolitan Theater, identified Defendant's Exhibit No. 2 as part of a ticket sold for admission at his theater on September 15, 1963, between 7:00 and 8:00 p. m.; but that his records do not indicate who purchased the ticket; that if an individual entered the theater at that time and watched both productions he would be out at "approximately eleven, eleven-thirty." Solomon Clark, an insurance counselor, testified that a young man (defendant) "called me by name" a little after 11:00 p. m. on September 15, 1963, near 47th and South Park; that they

333

had a brief conversation concerning defendant's prior occupation as a newspaper boy, and his present residence; that Clark ". . . just run my hand in my pocket and gave him my card and drove off." On cross-examination he testified that he recalled that defendant was his paper boy "after he renewed the acquaintance"; that he was not sure that he saw defendant on September 15, 1963, but that "it must have been about that time . . . [but] I didn't keep up with the date"; and that "I may have given him two (cards)."

Defendant presented two witnesses who testified that he had a good reputation in the community in which he lived.

Defendant's principal contention is that he was not proven guilty beyond a reasonable doubt. This is premised on the following: that the identification evidence was insufficient; that the alibi evidence raised a reasonable doubt as to his culpability; that there was no corroboration of the criminal act; and that the prosecutrix failed to make an immediate complaint.

Mrs. Davis gave a detailed description to Officer Jackson and again at the trial. The prosecutrix, who, according to her testimony, had fifteen minutes to view the defendant while he was in her small apartment, described his physical features: a Negro between 28 and 30 years, about 6′ 1″ tall. Her estimates of defendant's weight varied between 165 and 200 pounds; nevertheless, she observed that he filled "my whole doorway." She testified that his trousers were bluish-green or greenish-blue and that he wore big boots or brogans. Defendant described his boots as "big . . . Army boots"; he described his trousers as blue and his counsel opined that they were green. Defendant was picked up by the police after the attack, about six blocks from the Davis apartment, and taken to Billings Hospital where Davis identified defendant.

■ The fact that the identification was not in a "line-up" relates only to the weight of the evidence and not to its competency. People v. Crenshaw, 15 Ill2d 458, 464, 155 NE2d 599 (cert denied, 359 US 997); People v. Boney, 28 Ill2d 505, 509, 192 NE2d 920; People v. Cobb, 52 Ill App2d 332, 338–39, 202 NE2d 56.

■ The uncorroborated testimony of a prosecutrix is sufficient to support a conviction where such testimony is clear and convincing. People v. White, 26 Ill2d 199, 202, 186 NE2d 351. Corroboration is necessary where a victim changes her story, or where identification occurs months after the rape, or where the identification is uncertain. None of these elements is present in the instant case. Furthermore, Davis testified that: "My neighbors . . . looked out to see what the commotion was . . . . Yes, I told them all. I guess I must have been hollering." These immediate, spontaneous reactions corroborate her testimony that she had been raped.

While there were discrepancies as to the exact time of the arrest, it is evident that it took place at least one hour after the attack and in view of all the other evidence in the case they are of little significance.

Defendant's two-pronged alibi is based upon the Metropolitan Theater ticket stub (Defendant's Exhibit No. 2) and the testimony of Solomon Clark. It is uncontroverted that the ticket was purchased at the Metropolitan between 7:30 and 8:00 p. m. on September 15, 1963, and that a complete cycle of the features lasted over three hours. However, defendant's alibi is faulty in several crucial areas. It does not show: (1) who purchased the ticket (2) whether the purchaser entered the cinema, and (3) that if the purchaser entered, that he remained for the duration of the films.

Solomon Clark testified that he saw defendant about 11:00 p. m. on a Sunday in September in 1963 but that

he could not be positive that it was the night in question. Defendant testified that Clark had given him two (business) cards; however, Clark testified that he might have given him two. The thorough search of defendant by Officer Clark did not disclose either card.

Officer Carter testified that after he stopped the defendant, defendant referred only to the Regal Theater; that defendant could not recall what movie he had seen there; and that defendant had not been with or seen anyone whom he knew in the vicinity of the Regal Theater. In addition, the officer testified that the ticket stub which defendant gave him did not have a date or name on it. Therefore, this evidence was not adequate to establish a plausible alibi. People v. Guido, 25 Ill2d 204, 210, 184 NE2d 858. Nor was the jury required to believe the alibi evidence. People v. Ault, 28 Ill2d 34, 36, 190 NE2d 815.

Defendant repeatedly stresses the point that an individual the girth of defendant could not possibly enter a window which was 33 inches wide. We believe that the jury could reasonably have evaluated this contention in light of the evidence presented at the trial and in view of their common knowledge.

We find that defendant was proven guilty beyond a reasonable doubt.

Defendant contends that the jury was not properly instructed on the issue of identity because his proffered instruction was refused. In People v. Robinson, 27 Ill2d 289 at 292, 189 NE2d 243, the court held that:

> . . . where the abstract of record includes only the instruction complained of without regard to the other instructions, both given and refused, that since this court is not bound to search the record itself to supply abstract deficiencies, error cannot

336

be predicated upon the giving, refusal, or modification of that instruction. (People v. Todaro, 14 Ill2d 594; People v. Allen, 17 Ill2d 55.) We will not inquire whether the trial court erred in this respect. People v. Bybee, 9 Ill2d 214, 221, and cases there cited.

Since defendant's abstract of the record only contains his set of instructions we will not search the record to ascertain whether the trial court erred.

Defendant contends that the closing arguments of the State's Attorney prejudiced him because they were inflammatory in nature and based on facts not in the evidence.

■ In People v. Wright, 27 Ill2d 497, at 500–01, 190 NE2d 287 (cert denied, 375 US 925) the court stated:

> It is proper for the prosecuting attorney to reflect unfavorably on the accused, and to denounce his wickedness and even indulge in invective; he may dwell on the evil results of crime and urge a fearless administration of the law.

We hold that the State's Attorney's discourse on the evils of rape was not inflammatory and did not prejudice the defendant. Also see People v. DeMarco, 44 Ill App2d 459, 466, 195 NE2d 213.

■ Defendant claims that there was no evidence to warrant a comment by the State's Attorney in closing argument that defendant was "mentally ill." However, defendant's attorney, in his opening statement, asserted that defendant is ". . . what we commonly call retarded" and in his closing argument said:

> There's one thing about Arthur that I've observed for quite some time, and that is, that while he's retarded and hindered by nature . . . in his speech and his understanding, . . . he's honest. . . .

337

In People v. Halteman, 10 Ill2d 74, 139 NE2d 286, the court affirmed a conviction of the crime of taking indecent liberties with a minor. The court held that it was "fair comment" to refer to the defendant as a "moron." We find, in view of defendant's own attorney's opinion about defendant, that the statement of the State's Attorney was a fair comment and that it did not prejudice the defendant.

 The State's Attorney, in his closing argument, also suggested:

> Now, let's use our common sense and reason. Here's a man who is claimed to be retarded, 28 years old, and who has never gone out with a girl, sees a movie about sex. Isn't this sufficient to arouse the passion of the retarded man? A man who has never been with a woman?
>
> . . . . . .
>
> He wasn't after money, he was after a woman. He'd been inspired by the show he'd seen.

Defendant testified that he never had a girl friend and that he had been to a movie dealing with "sex" on September 15, 1963. We hold these arguments and statements are "based on the facts appearing in the proof or on legitimate inferences deducible therefrom [and] do not transcend the bounds of legitimate argument." Halteman, supra, p 83.

 Finally, defendant contends that the trial court erred in overruling his motion for a new trial. Defendant's motion and accompanying affidavits allege that Mrs. Davis used the telephone of a neighbor, Myrtle Woods, to summon the police and said nothing to the neighbor or the police about being raped. An application for a new trial which is allegedly predicated on newly discovered evidence is not regarded with favor by courts. In People v. Tillman, 383 Ill 560,

567, 50 NE2d 751, the court enunciated the principle that:

> To justify a new trial the newly discovered testimony must be conclusive and not merely cumulative. (People v. Mindeman, 318 Ill 157; People v. LeMorte, 289 Ill 11.) The burden is on the applicant for a new trial on the ground of newly discovered evidence to rebut the presumption that the verdict is correct. It must appear to be of such conclusive character that it will probably change the result if a new trial is granted. (Citing cases.)

See also People v. Dukes, 19 Ill2d 532, 538, 539, 169 NE2d 84 (cert denied, 365 US 830). The exercise of the court's discretion in ruling on a motion for new trial will not be disturbed except in the case of manifest abuse. People v. Holtzman, 1 Ill2d 562, 569, 116 NE2d 338. This matter raised in defendant's motion was not "newly discovered evidence" because such evidence was readily available at the trial. Williams v. The People, 31 Ill2d 516, 518, 202 NE2d 468. We hold that the trial court did not abuse its discretion in denying defendant's application.

Defendant's motion and affidavit also alleged that defendant was impotent and therefore incapable of intercourse. In his argument for a new trial, defendant's attorney stated that the knowledge of the impotency of defendant had not come to his attention until after the trial. He asked for a medical examination of defendant. This court ordered that the Criminal Court of Cook County conduct a further hearing on defendant's motion for a new trial to afford him an opportunity to present medical evidence as to his impotency and to redetermine said motion on the basis of the medical evidence. However, defendant filed a motion and affidavit declining the opportunity for a medical

examination on this issue and requested that a decision be rendered "in accordance to the evidence now before the court." We vacated the order.

The decision of the Criminal Court is affirmed.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.