THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE NIMS, a/k/a Bruce Marico, a/k/a Bruce Nimes, Defendant-Appellant.

First District (5th Division)   No. 85—1707

Opinion filed December 12, 1986.—Modified on denial of rehearing February 20, 1987.

LORENZ, J., specially concurring.
PINCHAM, J., dissenting.

Anselmo & Schwarzbach, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Kenneth T. McCurry, and Sharon L. Gaull, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial, defendant, Bruce Nims, was found guilty of home invasion, rape, deviate sexual assault and armed robbery (Ill.

Rev. Stat. 1981, ch. 38, pars. 12—11, 11—1, 11—3 and 18—2), and was sentenced to serve four concurrent terms of 25 years in the Illinois Department of Corrections. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt and that the State's failure to comply with a discovery request deprived him of a fair trial.

Complainant testified that at 4 a.m. on August 15, 1981, she was asleep in the bedroom of her Chicago residence when she was awakened by the sound of a cigarette lighter clicking on and off. Defendant, who was holding the lighter in one hand and a knife in the other, warned her to keep quiet or he would cut her. He then raped complainant and forced her to perform an act of fellatio. Complainant testified that although the room was dark and she was not wearing her glasses, she was able to see defendant's face because he was directly in front of her and the room was illuminated by light emanating from a side porch lamp and alley lights. She also stated that defendant lit a disposable cigarette lighter four or five times. Before leaving, defendant took complainant's locket and chain, her purse and the disposable lighter and threatened to kill her if she told anyone what had happened.

Complainant reported the incident to the police as soon as defendant left and described him as a male black, 5 feet 9 inches to 5 feet 10 inches tall with brown skin, a light mustache and combed-back "permed" hair, wearing faded blue jeans and a navy-blue sweater. Before taking her to the hospital, the police drove her to a location four or five blocks away to view a suspect. Complainant stated that the suspect was not her assailant. At the hospital, she again described the offender and estimated his weight to be between 150 and 160 pounds. The following day, she viewed several books containing mug shots, but was unable to identify the attacker. Two days later, however, complainant identified defendant's picture from an array of six photographs. She also was able to identify defendant in a lineup. Following complainant's initial identification, the police recovered from defendant's apartment a pair of blue jeans and a navy sweater which complainant identified as clothing worn by the offender. She recognized the blue jeans because they were faded and had zippers on the front.

Testifying for defendant, Officer Thomas Sheehan stated that complainant described the offender to his partner, Officer Colvin, as a male black, 5 feet 9 inches to 5 feet 10 inches tall who reeked of alcohol. The parties stipulated that in Colvin's report of his interview with complainant, she also stated that her assailant was 18 to 20 years old, had a thin build and weighed approximately 150 pounds,

and was wearing a blue or brown sweater and dark pants. Sheehan was not present when this information was conveyed to his partner. Colvin reported as "unknown" the description of the offender's eyes, hair and complexion. Investigator Raymond Binkowski testified that he was given a description of the offender as a male black in his early twenties, with a medium-brown complexion, 5 feet 8 inches or 5 feet 9 inches tall, approximately 155 pounds and wearing a blue shirt or sweater. Binkowski received this description not directly from complainant but from another investigator who was preparing a composite description of a suspect wanted in a series of rapes.

Defendant then called an evidence technician who had processed the crime scene for physical evidence. Although the premises were dusted for fingerprints, the only prints discovered were smudged and unsuitable for comparison. Muddy footprints were found but the impressions were too light to photograph. Another evidence technician testified that tests performed on defendant's clothing and shoes were negative for the presence of spermatozoa or blood. A soil comparison was impossible. At one point during defense counsel's direct examination, the witness referred to a report he had compiled, causing defense counsel to state:

> "Judge, just for the record, I just asked leave to mark a one page report as Defense Exhibit 2 for Identification. That is the first time to my knowledge that either myself or [co-counsel] has seen that report. *We are prepared to proceed.* I just wanted to make that known and tender a copy—or showing it to the State, who apparently has a copy." (Emphasis added.)

Defendant testified that he is a 27-year-old black male weighing 179 pounds, approximately 5 feet 8 inches tall, and has worn a goatee for many years. Defendant stated that he has a scar over his left eye and what defense counsel described as a "knot" over his right eye as a result of injuries he sustained in a robbery that occurred in March 1980. Two other witnesses confirmed that defendant had the facial scars and wore the goatee prior to August 15, 1981. Defendant testified that at the time of the incident, he was playing cards with several friends, including Tyrone Parham, Ernest Bailey and Jim Conway. The game ended at approximately 6 a.m. Although Parham corroborated this testimony, he never advised the police of defendant's whereabouts. Both defendant and his alibi witness had difficulty remembering the time, date and location of numerous other card games they had played in August 1981. Bailey and Conway did not testify although Conway was present at defendant's trial.

Opinion

I

Defendant initially contends that he was not proved guilty beyond a reasonable doubt because the testimony of complainant was neither clear and convincing nor corroborated by other evidence.

■■ ■ It is well established that the positive identification of a single witness is sufficient to support a conviction, provided that the witness is credible and observed the offender under conditions which would permit a positive identification to be made. (*People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615-18, 378 N.E.2d 1318.) This is true even where the defendant presents alibi testimony which is corroborated by other witnesses. (*People v. Shelby* (1984), 123 Ill. App. 3d 153, 165, 462 N.E.2d 761.) Discrepancies or omissions in detail do not destroy the validity of an identification, but rather affect the weight of the testimony and are to be evaluated by the trier of fact. (*People v. Shelby* (1984), 123 Ill. App. 3d 153, 462 N.E.2d 761; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.) With regard to identification testimony, it has been noted that "untrained persons may give varying descriptions of another person's physical characteristics" and that "an identification is not usually made by distinguishing separate features, but by the total impression made upon the witness." *People v. Shelby* (1984), 123 Ill. App. 3d 153, 165, 462 N.E.2d 761.

In the instant case complainant testified that although it was dark in her bedroom, there was sufficient illumination from a side porch light and nearby alley lights to enable her to see defendant's face. (She apparently was mistaken in her belief that light from a full moon was visible that night.) Additional illumination was provided by defendant's action in lighting a disposable cigarette lighter. Although the dissent correctly notes that complainant was not wearing her glasses when she was attacked, it overlooks her testimony that the intruder forced her to look at him for approximately 20 minutes during which time his face was very close to her own. Complainant admitted that she is nearsighted but stated that even without her glasses she had "a clear view" of her assailant.

Both defendant and the dissent maintain that the description which complainant gave to the police did not match defendant's actual physical appearance. We disagree.

Complainant described her assailant as a male black, 5 feet 9 inches to 5 feet 10 inches tall, weighing 150 to 160 pounds, with brown (or medium-brown) skin, a light mustache and combed-back

"permed" hair. While defendant testified that he is 5 feet 8 inches tall and weighed 179 pounds, the trial judge could observe for himself whether defendant's testimony regarding his height and weight was accurate. Moreover, defendant's weight at trial had no necessary relationship to his weight at the time of the offenses one year earlier. Defendant did not dispute that he had a light mustache and combed-back "permed" hair in August 1981. Neither complainant nor any other witness testified that she had estimated the offender's age. Investigator Binkowski was told by another investigator that the suspect who was wanted for a series of rapes, including this one, was in his early twenties. The parties stipulated, however, that complainant had told Officer Colvin that her assailant was 18 to 20 years old. In August 1981 defendant was 26 years old. In our judgment, the significance of this difference was a matter for the trial court to resolve.

██ █ The principal discrepancy between complainant's description and defendant's actual appearance concerns his facial scars and his goatee. Complainant did not mention these features when she was interviewed by the police. Although the photographs of defendant that were introduced into evidence[1] do reveal a "knot" or bump above his right eye and a small scar above his left eye, the lighting conditions when these photographs were taken obviously were better than they were at the time of the crimes. With respect to defendant's goatee, complainant did testify that her assailant had "a couple whiskers" on his chin but not "a beard." As the dissent concedes, no chin hairs are apparent in any of defendant's photographs. Complainant should not be faulted for not describing an invisible "goatee." An examination of the photographs included in the supplemental record does reveal the

---

[1]On motion of defendant made after we filed our original opinion in this matter, we ordered the State to make available to his attorney the photographs of defendant that were admitted at trial but which were not included in the record on appeal. Because the absence of these photographs from the original record was the subject of extended comment in the dissenting opinion, we allowed defendant's motion to include them in a supplemental record, which we have considered in our modified opinion. We note, however, that the dissent continues to criticize the State for not impounding these photographs and making them part of the record on appeal. This criticism clearly misses the mark. Defendant is the appellant in this appeal and it was his responsibility to preserve evidence presented at trial and to transmit that evidence to this court for our review. (*People v. Wilson* (1981), 92 Ill. App. 3d 370, 386, 415 N.E.2d 1315.) Defendant has been remiss in meeting this responsibility. Defense counsel waited more than five months after he discovered that the State had these photographs in its possession before he moved to have them produced. In light of this delay, the remark in the dissenting opinion that the photographs were "belatedly made a part of the record on appeal," apparently a reference to the State's failure to present them earlier, is gratuitous and misdirected.

presence of the "light mustache" to which complainant referred in her testimony.

As stated earlier, it is the total impression upon the witness rather than the distinguishing of separate features which generally forms the basis for an identification. (*People v. Shelby* (1984), 123 Ill. App. 3d 153, 164-65, 462 N.E.2d 761.) We agree with the trial court's finding that the alleged discrepancies between complainant's description of the offender and defendant's actual physical appearance were minor in nature and did not affect her credibility as a witness. The court found that complainant "had sufficient opportunity to make that identification" and that "her identification was without question correct." We will not disturb these findings.

The State introduced into evidence six photographs shown to complainant two days after she had been raped and one photograph of the four-man lineup conducted on the same day. The dissent waxes indignant over the State's failure to have these photographs impounded at trial and made part of the record on appeal and speculates at length about their possible probative value. Curiously, defense counsel, particularly at oral argument, did not seem to be at all troubled by what has so exercised the dissent. Indeed, counsel opined that the photographs may not have captured all of defendant's facial characteristics. In any event, we are unable to indulge in the conjecture offered by the dissent. Defendant is the appellant in this appeal and it was his responsibility to preserve evidence presented at trial. (*People v. Wilson* (1981), 92 Ill. App. 3d 370, 386, 415 N.E.2d 1315.) Had the photographs offered by the State possessed the evidentiary significance which the dissent attributes to them, surely defense counsel would have had them impounded and transmitted to this court as part of the record on appeal. At oral argument the assistant State's Attorney acknowledged that the State has these photographs in its possession. Nevertheless, defendant has made no effort to obtain these photographs and file them as a supplemental record. Under these circumstances, the outrage expressed by the dissent over their absence clearly is gratuitous and misdirected.

Defendant also challenges as unduly suggestive the identification procedures utilized by the police. It appears that two days following the incident defendant was arrested on a disorderly conduct charge. While in custody a police officer noticed his physical similarity to the description given by complainant and included his picture in a photographic array presented to her. Complainant identified defendant's photograph. Following this identification she was taken to the police station to view a lineup which included defendant. While at the sta-

tion she observed two photographs of defendant lying alongside the other five photographs which comprised the photographic array from which she had earlier identified him. Beneath defendant's photograph was an arrest slip containing his name and other information. Complainant then viewed the lineup and identified defendant as well as certain clothing confiscated from his apartment.

■ In addressing defendant's argument concerning the allegedly suggestive identification procedures, it is important to note that this is not a case in which the complaining witness made an identification from the first group of pictures shown to her. The record reveals that complainant viewed one suspect in person, then several books containing mug shots before finally identifying defendant's picture in a photographic array. Moreover, the allegedly suggestive procedure of allowing defendant's photograph, along with his arrest slip, to remain on a table within complainant's view occurred after she had identified his picture as that of her attacker. Under these circumstances, we find that defendant was not prejudiced by the identification procedures employed in the instant case.

■ Both defendant and the dissent stress that his alibi defense was corroborated and unimpeached. It is well established, however, that the trier of fact is not required to believe alibi evidence even though it is unrefuted. (*People v. Hunt* (1980), 90 Ill. App. 3d 496, 501, 413 N.E.2d 215.) The value of alibi evidence necessarily hinges upon the credibility and believability of the witnesses providing the alibi, questions which are within the exclusive domain of the trier of fact. (*People v. Hunt* (1980), 90 Ill. App. 3d 496, 413 N.E.2d 215.) Here, the trial court specifically found that defendant and his alibi witness were not telling the truth. We note further that their testimony regarding other card games that they played in August 1981 was vague and that two other potential alibi witnesses did not testify even though the record indicates that one of them was present for defendant's trial.

■ The dissent comments extensively regarding the lack of corroborative physical evidence in this case but ignores the reasons therefore. Although no evidence of spermatozoa or blood was discovered on defendant's clothes or his shoes (there was no testimony that complainant had been cut), these items of clothing were recovered two days after the offenses were committed, allowing defendant ample time to remove any incriminating physical evidence. The fingerprints found at the scene were smudged and unsuitable for comparison. The impressions made by the offender's shoes were too light to photograph and a soil comparison was impossible because defendant's

shoes had no dirt on them. Although none of complainant's property was recovered, defendant's apartment was not searched until two days after the offenses were committed. Defendant had more than adequate opportunity to dispose of the victim's property. We note, however, that the police did recover from defendant's apartment one pair of faded blue jeans with zippers on the front and a navy-blue sweater which complainant identified in court as clothing worn by her assailant.

Upon our review of the record, we are satisfied that defendant was proved guilty beyond a reasonable doubt.

## II

■ Defendant next contends that he was deprived of a fair trial as a result of the State's failure to provide him with a copy of an evidence technician's report, as required by the discovery rules. 87 Ill. 2d R. 412.

Illinois law provides that upon learning of an alleged nondisclosure, defendant must take affirmative action by seeking a continuance or by requesting appropriate sanctions and cannot wait until after the trial and verdict to complain. (*People v. Rogers* (1984), 122 Ill. App. 3d 384, 393, 461 N.E.2d 511.) In the absence of such affirmative action, the defendant will be found to have waived his objections to the nondisclosure. (122 Ill. App. 3d 384, 461 N.E.2d 511.) Furthermore, the State's noncompliance with a discovery requirement does not warrant reversal absent a showing of prejudice. (*People v. Velez* (1984), 123 Ill. App. 3d 210, 219, 462 N.E.2d 746.) In *People v. Foster* (1979), 76 Ill. 2d 365, 384, 392 N.E.2d 6, the Illinois Supreme Court stated that a defendant's failure to request a continuance or recess when confronted with a discovery violation is persuasive evidence that any alleged prejudice was in fact trivial.

In the instant case, the evidence technician who compiled the report was called as a defense witness and was examined thoroughly concerning the contents of the report. Although defense counsel noted "for the record" that neither he nor co-counsel previously had seen the report, he informed the court that "we are ready to proceed." With the above-stated principles in mind, we do not believe that reversal is warranted under these circumstances.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for the State's defending this appeal and incorporate it as part of our judgment.

Affirmed.

JUSTICE LORENZ, specially concurring:

I concur with the well-reasoned opinion authored by Justice Sullivan. I fear that our colleague's dissent adopts an analysis which jeopardizes the primary authority of the trial court as the trier of fact to weigh the evidence and determine the credibility of witnesses. Our dissenting colleague appears to be substituting his judgment for that of the trial court concerning the credibility of witnesses as affected by minor discrepancies in the description of the defendant. Yet this substitution of judgment is accomplished without the benefit of personal observation uniquely available to the trial court. This is not our function and I fear that silence on this issue would encourage this inappropriate practice in this court of review.

The dissent would have the majority reject the trial court's finding that the State's eyewitness was credible and that the defendant was proved guilty beyond a reasonable doubt. But to do so in this case would require that we discard well-established precedent which holds that minor discrepancies in descriptions of facial hair, scars, height, clothing and weight are primarily matters to be factored into credibility evaluation by the trier of fact and not matters to be reweighed by a reviewing court. (*People v. Danis* (1984), 129 Ill. App. 3d 664, 472 N.E.2d 1194; *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756.) Furthermore, as these cases expressly recognize, identifications are ordinarily based upon the total impression received by the witness rather than upon isolated features.

I believe that the defendant's guilt was established beyond a reasonable doubt. This court is not a proper forum for a trial *de novo*. We have no opportunity to observe the demeanor of witnesses. We have not had the trier of fact's view of the defendant so as to determine what facial features may or may not have been readily apparent. The trial court, not this court, had a basis for determining the accuracy of the assistant State's Attorney's characterization of the defendant's scars as not very visible. The trial court, not this court, could observe the defendant and determine whether alleged height or weight discrepancies were so evident as to reflect on the complainant's credibility.

As a reviewing court we have a solemn obligation not to substitute our judgment for that of the trier of fact on the weight of evidence or the credibility of witnesses. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) We are not a court of retrial; the trier of fact has already weighed the evidence and evaluated the credibility of

all the witnesses that the parties chose to present. We are now bound to consider all of the evidence in the light most favorable to the prosecution and then to determine whether any rational trier of fact could have found that all elements of the crime were established beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) In light of these principles, I specially concur with Justice Sullivan and affirm the convictions.

JUSTICE PINCHAM, dissenting:

I dissent. The defendant concedes that the evidence proved beyond a reasonable doubt that an assailant unlawfully invaded the complainant's home and therein robbed and sexually abused her. The defendant urges, however, that the evidence did not establish beyond a reasonable doubt that he was the assailant. He insists that he is innocent—that his conviction is one of mistaken identification and that the evidence established beyond a reasonable doubt that he was not the person who committed the offenses. I agree.

The specially concurring opinion urges that when a defendant on appeal contends for reversal of his conviction that the evidence failed to prove beyond a reasonable doubt that it was he who committed the offense, the trial court's guilty finding is indelibly engraved in stone, never to be erased, however erroneous, ill-founded, unsupported or unjust the finding may be. When a defendant on appeal contends for reversal that his conviction rests upon an identification which is doubtful, uncertain and does not produce an abiding conviction of guilt beyond a reasonable doubt, the duty of the reviewing court in resolving this basic and fundamental issue is most assuredly higher than the mere formality of favorably rubber-stamping the trial court's guilty finding.

The specially concurring opinion iterates the principles that "this court is not a proper forum for a trial *de novo*," that "we are not a court of retrial," that "we have no opportunity to observe the demeanor of witnesses," and that "the trial court, not this court, could observe the defendant." Yet, this specially concurring opinion runs afoul of "these principles" in concluding, "I believe that the defendant's guilt was established beyond a reasonable doubt."

The views set forth in the specially concurring opinion, purportedly in accord with the views of Justice Sullivan, are contrary to the following views expressed by Justice Sullivan for a unanimous court in *People v. Binns* (1975), 27 Ill. App. 3d 978, 982, 327 N.E.2d 369:

> "We have carefully read the testimony presented at trial, and we are mindful of the salutary principle that this court will not

disturb the findings of the trier of fact unless the proof is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Nevertheless, we must conclude that defendant was not proven guilty beyond a reasonable doubt of knowingly possessing marijuana. In view thereof, the judgment is reversed."* (Emphasis added.)

The law is clear and the cases are legion which hold that where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, the conviction will not be permitted to stand. I discuss but a few of these cases.

In reversing the defendant's conviction for armed robbery, home invasion and unlawful restraint entered on a jury's guilty findings in *People v. Ash* (1984), 102 Ill. 2d 485, 492-95, 468 N.E.2d 1153, the supreme court stated:

" *'[I]t is our duty,* where a verdict of guilty is returned by a jury *** not only to carefully consider the evidence *but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt* and is not sufficient to create an abiding conviction that he is guilty of the crime charged.' (People v. Bartall* (1983), 98 Ill. 2d 294, 305-06.) ***

The State argues that the [appellate] court *** erroneously substituted its judgment in place of the trier of fact in its appraisal of [Ash's] identification ***.

\* \* \*

*A conviction cannot be deemed to be sustained beyond reasonable doubt by the evidence if identification of the accused was vague and doubtful. (People v. Gardner* (1966), 35 Ill. 2d 564, 571; *People v. Cullotta* (1965), 32 Ill. 2d 502, 504; *People v. Hister* (1974), 20 Ill. App. 3d 933, 937.) [The] identification of ₍Ash was insufficient to support a conclusion that Ash was guilty beyond a reasonable doubt." (Emphasis added.)

The supreme court reversed the defendant's murder conviction because the evidence failed to establish beyond a reasonable doubt that the defendant was the offender in *People v. Kilgore* (1974), 59 Ill. 2d 173, 178, 319 N.E.2d 489. The court stated, "While questions of credibility and weight are for the jury, and we do not lightly take the step of reversing a jury's determination of guilt, this conviction cannot stand. *People v. Gardner* [(1966)], 35 Ill. 2d 564."

In *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232, a jury found the defendant guilty of rape. The appellate court affirmed the conviction. (*People v. Gardner* (1965), 61 Ill. App. 2d 326, 210 N.E.2d

545.) Granting leave to appeal, the only issue before the supreme court was whether the defendant's guilt was proved beyond a reasonable doubt. In reversing, the supreme court stated:

"This court has often held that: 'In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. *** And while the identification and whereabouts of the defendant at the time of the crime are questions for the jury, yet, where from the entire record there is a reasonable doubt as to the guilt of the accused, a judgment of conviction will not be permitted to stand. (*People v. Ricili* [(1948)], 400 Ill. 309; *People v. Gold* [(1935)], 361 Ill. 23.) Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed. (*People v. Fiorita* [(1930)], 339 Ill. 78; *People v. Kidd* [(1951)], 410 Ill. 271.) Neither can we disregard the evidence of alibi where the sole and only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime. *People v. Peck* [(1934)], 358 Ill. 642; *People v. De Suno* [(1933)], 354 Ill. 387.' *People v. McGee* [(1961)], 21 Ill. 2d 440, 444." *People v. Gardner* (1966), 35 Ill. 2d 564, 571, 221 N.E.2d 232.

The defendant was found guilty of rape and armed violence after a bench trial and sentenced to 20 years' imprisonment in *People v. Byas* (1983), 117 Ill. App. 3d 979, 453 N.E.2d 1141. In *Byas*, this court pointed out discrepancies in the complainant's description of her assailant which were strikingly similar to the discrepancies in the complainant's description of the assailant in the case at bar. The court stated:

"[T]he complainant's description of her assailant substantially differs from the actual physical characteristics of the defendant. The complainant initially described her assailant as being six feet tall, 170 pounds and in his early twenties. The next day, during a police interview, the complainant revised her description of the attacker, stating that he was 5 feet 11 inches tall, weighed approximately 175 pounds, was approximately 23 years old, darkly complected and had a hairy chest. In fact, the defendant is 5 feet 7 inches tall, weighs 147 pounds and has no hair on his chest or stomach. The State calls these discrepancies 'minor.' These are not trivial variances, and the State's evidence offers no explanation for these differences. (*People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133. See also

*People v. Carroll* (1970), 119 Ill. App. 2d 314, 256 N.E.2d 153 (substantial variance in height, weight and presence of beard); *People v. Barney* (1965), 60 Ill. App. 2d 79, 208 N.E.2d 378 (variances in height, weight and posture).) In particular, the absence of a physical characteristic which the witness claims the defendant possesses undercuts the strength of her identification. (*Cf. People v. King* (1973), 10 Ill. App. 3d 652, 295 N.E.2d 258 (failure to assert a distinctive physical feature which the defendant possesses is *prima facie* inconsistent conduct which, unexplained, tends to discredit the witness).) The State coyly contends that the trial court observed the defendant's chest and could determine for itself the degree of hair on it. The uncontradicted evidence is that the defendant has no hair on his chest." (*People v. Byas* (1983), 117 Ill. App. 3d 979, 985-86, 453 N.E.2d 1141.)

Byas contended that the evidence failed to establish his identity beyond a reasonable doubt. This court held:

"We agree with this contention and reverse the defendant's conviction.

Although a reviewing court will not substitute its judgment for that of the fact finder on matters of weight and credibility, a conviction cannot be sustained if the identification of the accused is vague, doubtful or uncertain. (*People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691.) Moreover, '[i]f a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case.' (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96.) In this case, the evidence of the defendant's identification is insufficient to sustain his conviction." 117 Ill. App. 3d 979, 984, 453 N.E.2d 1141.

Reversing an armed-robbery conviction because the identification testimony did not produce an abiding conviction of guilt, this court held in *People v. Carroll* (1970), 119 Ill. App. 2d 314, 320, 256 N.E.2d 153, that "[t]he State must obtain a conviction on the basis of proving beyond a reasonable doubt that the defendant committed the crime charged."

In *People v. Barney* (1965), 60 Ill. App. 2d 79, 81, 208 N.E.2d 378, the jury's guilty finding and the judgment entered thereon of the defendant's unlawful sale of narcotics to an Illinois State narcotics inspector was reversed because the identity of the defendant was not proved beyond a reasonable doubt.

The statements of the specially concurring opinion that reversal in

the case at bar requires "substituting [our] judgment for that of the trial court concerning the credibility of witnesses," and "would require that we discard well-established precedent," and that "silence on this issue would encourage this inappropriate practice in this court of review," are ill-founded, violative of and repugnant to the foregoing authorities.

Moreover, the authorities upon which the specially concurring opinion relies are not analogous to or on point with the case at bar. In *People v. Danis* (1984), 129 Ill. App. 3d 664, 472 N.E.2d 1194, the defendant, a hitchhiker, rode with the victim, a truck driver, for two days from Sioux City, Iowa, to near Salina, Kansas. The defendant was later identified by a liquor store clerk as the person who visited the store frequently over a three-week period and who cashed checks which had been stolen from the truck driver. The truck driver also identified the defendant as the hitchhiker who rode with him in his truck from which the checks were stolen. In affirming the defendant's forgery conviction the court pointed out that prior acquaintance with the accused strengthened the reliability of the witnesses' identification testimony. The court added in *Danis* that "it is axiomatic that a conviction cannot be sustained if the identification of the accused was vague, doubtful or uncertain (*People v. Ash* (1984), 102 Ill. 2d 485, 494) ***." *People v. Danis* (1984), 129 Ill. App. 3d 664, 667, 472 N.E.2d 1194.

*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182, relied on in the specially concurring opinion, did not involve the credibility of the defendant's identification. In *Novotny*, the defendant admitted his participation in a brawl out of which his aggravated-battery conviction arose. The controversy in *Novotny* was over how the brawl was precipitated, "the complaining witness relating one version of events and the defense witnesses portraying a completely different picture." 41 Ill. 2d 401, 411, 244 N.E.2d 182.

In *People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, on which the specially concurring opinion relies, the court stated that "[i]n weighing the sufficiency of evidence in a criminal case, the finding of the trier of fact will be affirmed unless the court of review can form a reasonable and well-founded doubt as to the defendant's guilt." (52 Ill. App. 3d 583, 587, 367 N.E.2d 756.) The court further stated, however, that "[w]here the circumstances do not afford a favorable opportunity for positive identification that evidence may not be sufficient to sustain guilt beyond a reasonable doubt where faced with a plausible alibi." (52 Ill. App. 3d 583, 588, 367 N.E.2d 756.) The court held that the identification by the hotel night auditor of the

defendant as one of the three men who robbed her in the "well-lighted hotel lobby" sustained the jury's guilty finding.

*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, cited in the specially concurring opinion, was a triple murder prosecution in which a participating accomplice testified for the State. The credibility of the defendant's identification was not an issue. *Collins* is therefore not on point.

Contrary to the specially concurring opinion, as I heretofore pointed out, in the case at bar, and in *People v. Byas* (1983), 117 Ill. App. 3d 979, 986, 453 N.E.2d 1141, the discrepancies in the complainant's descriptions of her assailant were not *minor* or *trivial variances*. Her descriptions and identifications were contradictory, inconsistent, flagrantly flawed, unconvincing and did not produce an abiding conviction beyond a reasonable doubt that the defendant Nims was the assailant.

The Supreme Court expressed the hazards of mistaken identification in the landmark case, *United States v. Wade* (1967), 388 U.S. 218, 228, 18 L. Ed. 2d 1149, 1158, 87 S. Ct. 1926, 1933, as follows:

"[I]dentification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. *The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.* Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? *The identification of strangers is proverbially untrustworthy.* The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.' " (Emphasis added.)

The defendant in the instant case was 27 years of age. He attended Morgan Park High School through the 11th grade. He left school to enter the United States Navy on October 13, 1972. He served as a gunner's mate on the U.S. Hacienda on the west bank cruise, Thailand, Hong Kong, Japan and Vietnam. He was awarded the Vietnam Service Medal by the Republic of Vietnam and the Vietnam Campaign Medal by our nation for performance of his military duties. He was honorably discharged from the Navy with a rank of E-5 on February 26, 1974. He thereafter attended the Chicago 63rd and Green Streets Urban Progress Center and obtained his General Education Diploma, a high school diploma equivalent. The record reveals that the defendant had never been charged with the commission of a felony offense and that his only convictions were on June 25, 1974, for battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—3), for which he was

fined $15, and on March 23, 1978, for unlawful possession of ammunition (Ill. Rev. Stat. 1985, ch. 38, par. 83—2(a)), to which he pleaded guilty and was sentenced to four days' imprisonment, which was considered served. In the case at bar the defendant was sentenced to concurrent imprisonment terms of 25 years for rape, 25 years for armed robbery, 25 years for home invasion, and 25 years for deviate sexual assault. A review of the evidence reveals that it failed to establish beyond a reasonable doubt that it was the defendant, Bruce Nims, who committed these offenses. More importantly, unrebutted evidence established that this defendant did not commit the offenses.

In her numerous descriptions of the assailant to the various police officers who interviewed her, the complainant never mentioned that her assailant had any marks or scars on his face. Yet, three witnesses testified, without contradiction, that on the date the offenses were committed, August 15, 1981, the defendant had a knot over one eye and a scar over the other which were inflicted upon the defendant when he was mugged and robbed in March 1980.

Theresa Ann Sanders, a defense witness, testified that she had known the defendant for nine years, five years of which she had been his girlfriend, and had resided with him until 1978, that the defendant was the father of her daughter and that she had had an ongoing relationship with him since 1978. She further testified that the "mark" over the defendant's left eye and the knot over his right eye were inflicted on the defendant's face in 1980 when he was mugged. Ms. Sanders was not asked a single question on cross-examination.

Euzella Nims, another defense witness, testified that she was the defendant's stepmother and that she had known the defendant for over eight years. She said that the "mark" over the defendant's left eye and the knot over his right eye were inflicted when the defendant was robbed "over a year or so ago." On cross-examination by the State, Ms. Nims was asked:

"Do you know if those 2 marks, the one above the left eye and the one above the right eye, were from the same incident?"
Ms. Nims responded:

"I would say it was the same incident, because when the bandages was on his head when we went to see him, we requested to see the marks."

During the defendant's direct examination, the trial judge stated that he observed the scar on the defendant's face. The following occurred:

"Q. Mr. Nims, again addressing ourselves to your facial area, could you tell the Court how you obtained the scar over your

left eye.

A. I got robbed.

Q. Could you tell us the date—the approximate date?

A. About March 15th.

Q. What year please?

A. '80.

Q. And could you tell the Court something about that incident?

MR. KLINE: Objection, your Honor.

THE COURT: What is the relevance?

MR. KURZ: I'm trying to bring out to the Court the severity of the injury.

THE COURT: *I can observe the scar.* He has told me that— *Let the record show I have seen the scar over the right eye.*

Q. (Continuing by Mr. Kurz) Directing your attention to what I would describe as a knot over your right eye, could you tell the Court how and when you obtained that injury?

A. I was robbed.

Q. And Mr. Nims, did you on August 15, 1981 rape [the complainant]?

A. No, I didn't.

Q. Mr. Nims, directing your attention to your appearance, is your appearance today—facial features, your hair, your chin growth, the beard on your chin, the scar—any different than it was a year ago?

A. No." (Emphasis added.)

Although the trial court granted the assistant State's Attorney's request for a brief delay so that he could further observe the scars on the defendant's face before he cross-examined the defendant, the assistant State's Attorney did not ask the defendant a single question on cross-examination about his facial scars. The scar was clearly visible to the trial judge. The defendant took the witness stand and thereby made himself available to the assistant State's Attorney to establish by cross-examination the dimensions and indeed the visibility of the knot and scar over the defendant's eyes. The assistant State's Attorney elected not to ask the defendant or any other witness about the knot or scar, their dimensions or whether they were visible.

The defendant was arrested on August 17, 1981, two days after the complainant was attacked. No witness was called by the State to dispute that the defendant's face was marked with a scar and knot over his eyes when he was arrested. Although the State called the complainant as a rebuttal witness and questioned her about her assail-

ant's wearing apparel (hereinafter discussed in more detail), she too was not asked a single question about her failure to have mentioned a knot or scar on her assailant's face when she described him to the police. She made no valid attempt to explain these pertinent omissions. The conclusion is inescapable that it was not this defendant who attacked her.

The complainant testified that she would have told the police about the defendant's facial scars if she had been asked about them. Had the defendant been the assailant, it would seem that in describing her assailant, the complainant would have readily told the police that he had a knot and a scar over his eyes. The complainant's explanation for not telling the officers about the knot and scar on her assailant's face—because the officers did not ask her—is unsatisfactory and unacceptable. Moreover, the officers would have no way of knowing that the assailant had a knot over one eye and a scar over the other in order to ask the complainant about such features.

Here is the complainant's imbroglio. On one hand, she did not see the defendant's knot and scar and the lighting conditions, according to the complainant and the majority, were adequate for the complainant to make an accurate identification of her assailant's face. Yet, on the other hand, the lighting conditions were inadequate for her to readily see a knot and scar over her assailant's eyes, even though, according to the majority: (a) "there was sufficient illumination from a side porch light and nearby alley lights to enable her to see defendant's face"; (b) "[a]dditional illumination was provided by defendant's action in lighting a disposable cigarette lighter"; (c) "the intruder forced her to look at him for approximately 20 minutes during which time his face was very close to her own"; and (d) the complainant "had 'a clear view' of her assailant." The defendant's argument is convincing and persuasive that the complainant did not see the scar and knot on his face simply because he was not the assailant.

There are other aspects of this case which warrant further discussion. During the complainant's direct examination the assistant State's Attorney asked her to identify the picture of the defendant which she had selected as the picture of her assailant from the six pictures which were shown to her by the police in her home on August 17. The defendant's picture was marked and was admitted into evidence as a State's exhibit.

The State argued in its brief before this court:

"In addition, defendant suggests that [the complainant's] testimony is inherently unbelievable because she failed to mention in her initial description of defendant defendant's scars and

chin hairs. Unlike the trier of fact, this Court is unable to observe defendant. *Although a photograph of defendant was admitted into evidence at trial, defendant failed to properly preserve the record, and therefore the photograph of defendant is not included in it.* \*\*\* Therefore this Court, which has had no opportunity to observe defendant, should not substitute its judgment for that of the trier of fact, who did have an opportunity to observe defendant. This conclusion is further supported by references in the record made by individuals who had an opportunity to observe defendant that defendant's scars and few chin hairs were not as obvious and visible as defendant would have this Court believe." (Emphasis added.)

During oral argument before this court the assistant State's Attorney was asked:

"Who has the [defendant's] picture now?"

Notwithstanding the foregoing argument in the State's brief, the assistant State's Attorney responded:

"[I]t is in the State's Attorney's possession."

To present such an argument in its brief and then admit during oral argument that the defendant's picture was in the State's possession falls far below that standard of appellate advocacy expected of the attorney for the State.[1]

This court also asked the assistant State's Attorney during oral argument why the State had not brought the defendant's picture before the court by supplementing the record on appeal. The reason offered by the State for not having done so was because the defendant failed to have the picture, a State's exhibit, impounded in the trial court. I find this explanation to be unsatisfactory, ludicrous, specious and absurd. Moreover, the record does not reveal and the State has not attempted to explain why the State did not have the defendant's picture impounded on March 17, 1983, the date the State had the trial court impound the defendant's shoes, sweater, blue jeans, a cigarette lighter, a Vitullo Evidence Kit, medical evidence slide and a collection box, none of which was offered or admitted into evidence as a State's exhibit.

---

[1]In response to another question from the court during oral argument, the State stated that it would endeavor to obtain and sustain a guilty finding based upon the single, uncorroborated, identification testimony of a victim that her assailant did not have a goatee, a knot or a scar over either eye even if the accused and subsequently convicted defendant, without question, had each of these unique characteristics at the time the offenses were committed.

The pictures were made a part of the record on appeal, after the original opinion and dissent were filed. These pictures clearly reveal a knot and a scar over the defendant's eyes. I will not speculate on whether the lighting conditions were better when the photographs were taken than at the time of the crimes. Suffice it to say, if the lighting conditions were adequate for the complainant to accurately identify the defendant as her assailant she would have seen the knot and scar over his eyes.

The defendant's facial scars were visible to the trial judge and the assistant State's Attorney during the trial. The evidence is uncontradicted that the scars were on the defendant's face when he was arrested, as well as two days before his arrest when the offenses were committed. The complainant did not see the scar and knot on the defendant's face because he was not her assailant.

On direct examination the complainant testified that she described her assailant as having a "light mustache" to the officers who arrived at her home immediately after the attack. But on cross-examination she testified:

"Q. Did you tell them about any goatee or facial or other facial hair other than a light mustache?

A. No, I didn't.

\* \* \*

Q. Did you tell them that he had any hair on his chin?

A. No, I didn't tell him that.

Q. Did they ask you about any kind of facial hair?

A. They asked me did he have a mustache and I said a light one.

Q. But they didn't ask you about whether or not he had hair on his chin?

A. No.

Q. So, then, you didn't tell them?

A. Right.

Q. If they had asked you about hair on his chin, you would have told him?

A. Would I have told him?

Q. Yes?

A. Yes.

\* \* \*

MR. KURZ: Q. Did the officers ask you it was important since the incident just happened a few minutes before and this person was still at large, that it was important for you to give as a complete description as you could?

A. At that time I was very upset, I said what I could."

The complainant also testified on cross-examination:

"Q. And the person didn't have hair on his chin that night, did he?

A. A couple of whiskers, not, you know, a beard or anything."

The unrebutted evidence established that the defendant had a goatee long before and at the time of his arrest. Theresa Ann Sanders testified on direct examination:

"Q. Directing your attention to Mr. Nims' chin, and specifically to the goatee there, how long has Mr. Nims to your knowledge had that goatee?

A. As long as I have known him.

Q. And that date again is?

A. Since—that was in 1974."

Ms. Sanders was not cross-examined by the State.

Euzella Nims, the defendant's stepmother, testified on direct examination that the defendant had a goatee and hair on his chin for the eight years she had known him. On cross-examination Ms. Nims testified that she had never seen the defendant without a goatee and that "Ever since I've known him I have seen a goatee on him." The defendant testified on direct examination:

"Q. Directing your attention to your goatee, the hair on your chin, how long have you had that goatee?

A. Since 1972.

Q. Why do you remember that date?

A. Because I had to shave it off in bootcamp.

Q. And have you shaved since?

A. Not after I came out of bootcamp and it grew back."

On cross-examination the defendant was not asked about his goatee or his facial hair.

The evidence is unrefuted that the defendant had a goatee when he was arrested and long before that time. The complainant did not mention to the numerous police officers who interviewed her that her assailant had a goatee. She described her assailant to the officers as having a "slight mustache." If the defendant, with his goatee, had been her assailant it would seem that the complainant would have told at least one of the officers that her assailant had a goatee, a beard or some type of facial hair. The absence of such a description by the complainant to the officers and the uncontradicted evidence about the defendant's goatee established that it was not this defendant who attacked the complainant.

Due to the dark color tone of the defendant's picture, belatedly made a part of the record on appeal, a goatee on the defendant's face is undiscernible. The complainant testified on cross-examination that she was unable to see facial hairs on the defendant's picture which was shown to her during trial. The complainant also testified, however, that her assailant had a mustache and "a couple of whiskers." Thus, the majority's assertion that the "complainant should not be faulted for not describing an invisible 'goatee' " is not persuasive. What is persuasive, however, but for which she should not be necessarily faulted, is that she did not describe a clearly visible knot over one of the defendant's eyes and a clearly visible scar over the other eye. Moreover, the complainant did not testify that the defendant did not have a goatee (or a knot over his right eye or a scar over his left eye) when she saw him in the lineup on August 17 or when she observed him during trial. The assistant State's Attorney did not ask the complainant one question about the defendant's goatee on direct examination during her in-court observation and identification of him during the State's case in chief or on her direct examination during the State's case in rebuttal.

The defendant testified on direct examination about his goatee. The assistant State's Attorney made no effort on cross-examination to establish the thickness or the dimensions of his goatee. In fact, the assistant State's Attorney did not ask the defendant a single question about his goatee. Theresa Ann Sanders, a defense witness and the defendant's former girlfriend and the mother of the defendant's minor child, also testified on direct examination about the defendant's goatee. The assistant State's Attorney did not cross-examine Ms. Sanders. Euzella Nims, a defense witness and the defendant's stepmother, testified on direct examination that the defendant had a goatee during the entire eight years that she had known him. The assistant State's Attorney did not attempt to establish through cross-examination of Ms. Nims the length, width or thickness of the hairs in the defendant's goatee. The only questions asked of her on cross-examination regarding the defendant's goatee was whether she had seen Nims within the past few years without a goatee. Ms. Nims responded that she had seen a goatee on the defendant ever since she had known him.

The complainant was attacked at about 4 a.m. on August 15, 1981, in her bedroom. She testified on direct examination that during the attack her assailant flicked a cigarette lighter on "about four or five times." She said, "[T]here was a little light showing in my room and it was a full moon that night." The complainant testified

on cross-examination, however:

"Q. Yet you indicated that it was a full moon that night, is that correct?

A. Yes.

Q. And do you recall whether it was raining that night?

A. Yes, it was.

Q. It was raining, but yet you could see the moon through the rain, is that correct?

A. At the time that it happened it didn't rain, it wasn't raining at the time."

It was thereafter stipulated that if Mr. Peterson, a chief meteorologist, was called to testify he would testify that on August 15, 1981, at 4 a.m. the moon was not likely visible at Midway Airport in Chicago, that the boundary of the cloud cover at 4 a.m. on August 15 was east to LaFayette, Indiana, and South Bend, Indiana, south to Peoria, Illinois, west to Rockford, Illinois, and north to Wisconsin, that there was a solid overcast on August 15, 1981, until noon and that 4 a.m. was approximately two hours before the sunrise at 5:58 a.m. on that date.

Although this stipulated testimony did not dispute the complainant's testimony that there was a full moon that night, it certainly contradicted the complainant's inferences that she saw the moon and that there was moonlight in her bedroom, which aided her in seeing and identifying her assailant. Even though adequate lighting in the complainant's room was crucial to her ability to see and correctly identify her assailant, nevertheless, the majority gracefully treats the complainant's attempt to enhance her identification by erroneous moonlight testimony as simply her mistaken belief about the lighting conditions on a night which just happened to have been rainy and solid overcast.

The complainant testified that she wore glasses at all times except when she was asleep, that she was not wearing her glasses during the attack and that she did not at any time observe her assailant while wearing glasses. The record does not disclose the nature of her visual infirmity.

Not only did the complainant fail to mention a goatee, a knot or a scar on her assailant's face in her description of her assailant to the police, there are other significant discrepancies between the assailant's description which the complainant gave the police and the defendant's actual description. To Officer Colvin the complainant described her assailant as 18 to 20 years old, of a thin build, who weighed approximately 150 pounds, was between 5 feet 9 inches and

5 feet 10 inches tall, and whose complexion was unknown.[2] The defendant testified that he was 27 years of age, 5 feet 8 inches tall and weighed 179 pounds.[3] Thus, the defendant was seven to nine years older, 1 to 3 inches shorter and 29 pounds heavier than the offender described by the complainant. Although the complainant testified that she told the officers that the complexion of the assailant was "brown skin" and that she did not tell any officer that she did not know the complexion of her assailant, the testimony of Officer Colvin, a defense witness, that the complainant told him that the assailant's complexion was unknown, unequivocally contradicted the complainant's testimony.

The majority concludes that the discrepancy between the complainant's described age of her assailant of 18 to 20 years and the defendant's actual age of 26 years was not material. I do not agree. The purpose of an age description is to aid in the identification of the assailant. Such an age discrepancy as in the case at bar should not be dismissed simply as immaterial.

Regarding the discrepancy between the assailant's height described by the complainant as 5 feet 9 inches to 5 feet 10 inches and weight of 150 to 160 pounds, and the defendant's actual height of 5 feet 8 inches and weight of 179 pounds, to which the defendant testified, had the assistant State's Attorney desired to dispute the defendant's testimony of his height and weight, he could and should have done so by cross-examining the defendant, by presenting rebuttal height and weight testimony, or by having the defendant's height and weight measured in open court. The assistant State's Attorney chose not to do so.

The majority accurately points out that the "defendant did not dispute that he had a light mustache and combed-back 'permed' hair in August 1981." He was not asked if he had a light mustache or combed-back "permed" hair in August 1981, nor were the defendant's former girlfriend or stepmother asked these questions which the assistant State's Attorney clearly could have asked. The assistant State's Attorney having elected not to inquire of the defendant or his witnesses about the defendant's mustache or hair style when the offenses were committed, no worthy significance can be attributed to the defendant's not having disputed that he wore a light mustache or combed-back "permed" hair in August 1981.

---

[2]Officer Colvin's testimony was admitted by stipulation during presentation of the defense.

[3]The defendant testified that he weighed a little less on August 15.

There was also a contradiction between the complainant's testimony of her description of the assailant's wearing apparel which she gave at trial and the complainant's description of the assailant's clothing which she gave the police officers. The complainant testified on direct examination that the assailant wore a navy-blue sweater and blue jeans. On cross-examination she denied that she told the officers that the assailant wore a blue or a brown sweater or dark pants and stated that if an officer testified that she told him that her assailant wore a blue or brown sweater, the officer "would be wrong." Officer Colvin again contradicted this testimony. He testified that the complainant described the assailant's clothing to him as "a blue or brown sweater and dark pants."

Shortly after the complainant reported the incident to the police and described her assailant to them, the officers took the complainant from her home to Sangamon Street or Peoria Street, a few blocks away, where she viewed a suspect who was in police custody. She did not identify the suspect as her assailant and told the officers that "[i]t wasn't him." The State made no effort to have the complainant or any other witness describe this suspect's physical appearance or wearing apparel. The State did, however, successfully thwart the defense attorney's attempts to establish these vital descriptions by the trial court's sustainment of objections to questions which were designed to elicit this information. The record does not reveal the basis for the State's objections or the ground on which the trial court sustained them. The defendant's attorney was precluded from establishing whether there was or was not any similarity between the description of this suspect and the description of the defendant and the description of the assailant which the complainant gave the police officers.

The unusual manner and peculiar circumstances of the complainant's identification of the defendant as her assailant are indeed notable. The complainant testified on cross-examination that the morning she was attacked, after she left the hospital she went to the police station and viewed books of mug shots. She did not identify her assailant from the mug shots.

The defendant was arrested two days later at about 1:30 or 2:30 a.m. on his girlfriend's porch. Because the defendant did not have a key the landlady refused to let him in the apartment and an argument ensued. The defendant sat on the porch and went to sleep and the landlady called the police. She told the police that she did not want any charges filed against the defendant and to just get the defendant off her property. The police arrested the defendant for dis-

orderly conduct.

Later that morning, while the defendant was in custody at the police station, the complainant received a telephone call from the police. The identity of the officer who called was not established. Strangely, the officer asked the complainant if she would be wiling to testify in court if they apprehended her assailant. The complainant told the officer that she would. The officer also told the complainant that they had not yet apprehended the offender. The alacrity and the unique simplicity with which the defendant was thereafter identified and accused as the complainant's assailant is startling and suspect.

Detective Raymond Binkowski, who was not called as a State's witness but who was called as a defense witness, testified that on August 17 he saw the defendant in the Sixth District police station, where the defendant was under arrest for disorderly conduct. Binkowski testified that when he saw the defendant he "noted a similarity in his physical description and the physical description of the offender in the rape of the complainant." Binkowski testified that he had been orally given the description of the complainant's assailant by detectives in his unit but that he did not recall when he was given the description.

According to Binkowski, the only physical description of the complainant's assailant that he was given was "*a male black, medium brown complexion, approximately 5'8"—, around 155 pounds in the early 20's.*" (Emphasis added.) According to the complainant's testimony, the physical description of the assailant she gave the police was that he was brown-skinned, 5 feet 9 inches to 5 feet 10 inches tall and weighed 150 to 160 pounds. She did not testify that she gave the police the age of her assailant. According to Officer Colvin's testimony, the complainant described her assailant to the police as "complexion unknown, between 5'9" and 5'10" tall, thin build, approximately 150 pounds and 18 to 20 years of age."

There was nothing unique about either of these three descriptions, *i.e.*, Detective Binkowski's description, the complainant's description at trial, or the complainant's description to Officer Colvin, that would warrant the belief that the defendant was the offender. Each of the three descriptions was scanty and general and fit the description of thousands of Chicago black youths. None of the descriptions were sufficiently distinctive to warrant the arrest of anyone who matched the scanty, general description. More importantly, none of the three descriptions fit the description of the defendant, a black male 5 feet 8 inches tall, 176 pounds, 27 years of age and who

had a goatee, a knot over his right eye and a scar over his left eye, the presence of which Binkowski neither confirmed nor denied.

Binkowski did not consider the defendant's wearing apparel in his assessment that the defendant fit the assailant's description which Binkowski had been given. The defendant's uncontroverted testimony established that when he was arrested he was wearing a brown sweater, a pair of beige pants, a beige London Fog trench coat, brown shoes and brown socks. Binkowski testified:

"Q. What was Mr. Nims wearing when you saw him at the 6th District station on the 17th of August, 1981 in the early morning hours?

A. I don't recall the clothing he had on, sir.

Q. Do you recall whether his clothing matched his description of the offender that you were looking for?

A. I don't recall that, sir."

This testimony established that Binkowski ignored what the defendant was wearing when he determined that the defendant fit the assailant's description.

Although the State had a picture of the defendant, the record does not reveal when or by whom the picture was taken. It is reasonable to assume that the picture may have been taken after the defendant was in the police station following his arrest on August 17. The record does not reveal whether the defendant's picture was taken before or after Binkowski saw the defendant in the police station and decided that his appearance fit the description of the victim's attacker.

The record also does not reveal whether Binkowski's assessment that the defendant was possibly the assailant was before or after the officer's telephone call to the complainant to inquire whether she would testify if her assailant was apprehended. Later, during the morning of August 17, and after the complainant received the call and said that she would prosecute her assailant, an officer came to the complainant's home and showed her six pictures. The complainant was asked if one of the persons whose picture was shown to her was the picture of her assailant. The record does not reveal whether it was Officer Binkowski who showed the picture to the complainant, but one of the pictures was a picture of the defendant.

During the telephone conversation in which the complainant expressed her willingness to testify, the complainant was also told by the officer that her assailant had not yet been apprehended. For officers to shortly thereafter arrive at the complainant's home, show her six pictures and ask her if any person in the pictures was her assail-

ant very well may have suggested to her that the officers had apprehended her assailant and that his picture was among the group of pictures shown her.

This suggestion would be enhanced if the defendant's picture was the only one among the group similar to the assailant's description. Although the six pictures were admitted into evidence as a State's exhibit during trial, they are not included in the record on appeal. Moreover, the record does not reveal the description of the persons in the six pictures or the description of the five other persons whose pictures were portrayed. There is no indication that any of the five other pictures either closely or remotely matched or resembled the defendant.

Regarding the dangers of suggestive identification the Supreme Court stated in *United States v. Wade* (1967), 388 U.S. 218, 228-29, 18 L. Ed. 2d 1149, 1158-59, 87 S. Ct. 1926, 1933:

"A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such error than all other factors combined.' [Citation.] Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest."

The complainant in this case testified that she selected the defendant's picture from six pictures shown to her and that in the photo she selected the defendant was wearing a brown jacket and a beige-brown sweater. This clothing was not similar to the assailant's clothing which she described during the trial—blue jeans and a blue sweater. Like Officer Binkowski, the complainant was also uninfluenced by the defendant's clothing in her picture identification of him as her assailant.

Officer Binkowski and his partner, Officer Kushner, transported the defendant from the Sixth District police station to Area Two Headquarters. Whether they took the defendant there before or after the complainant selected his picture from the group of six pictures is not disclosed in the record, nor does the record disclose the identity of the officer who directed the complainant to go to Area

Two Headquarters; but after she arrived, she viewed a lineup. The officer who conducted the lineup was not called as a witness and the record does not reveal his identity. It may or may not have been Officer Binkowski. There were four men in the lineup. The defendant was one of them. The complainant identified the defendant in the lineup as the person who attacked her.

The defendant not only denied committing the offenses, he also consented to Binkowski's search of his home. Pursuant thereto Binkowski searched and seized from the defendant's home a pair of the defendant's shoes, a blue sweater and a pair of blue jeans. Whether this seizure was before or after the complainant's lineup identification of the defendant is not disclosed by the record. The defendant denied that he was wearing the seized garments on the date on which the offenses were committed. The garments were microscopically examined by a Chicago police department crime laboratory chemical microanalyst and no semen was found in them.

Regarding the defendant's shoes that Binkowski testified he seized from the defendant's home, the majority fallaciously asserts that "a soil comparison was impossible because defendant's shoes had no dirt on them." This assertion is misleading and demands clarification.

On direct examination the complainant testified:

"Q. And did you observe anything unusual in the kitchen after the incident?

A. Yes, it was mud prints.

Q. Where, exactly, did you observe mud prints?

A. One on the sink and one on the floor and some in the living room."

Detective John Gallagher, the only witness other than the complainant who was called by the State, testified on direct examination that shortly after the complainant was attacked, he and his partner, Detective Diogardi, went to the complainant's home. Gallagher further testified:

"Q. And what, if anything, did you notice unusual about the conditions at the house?

A. Once we were in the residence, we went to the kitchen area and we noticed that the kitchen window had been forced open, the screen that was in the window had been pushed in, there was mud on the kitchen sink, there was mud on the kitchen floor, there was mud on the carpeting, say in the hallway going into the living room.

Q. Can you describe, specifically, how the mud appeared on

the sink?

A. It appeared in the form of like a footstep, like someone had mud on their shoes and stepped on it."

But, Jim Sanders, a police department evidence technician, testified that "there were some *faint traces of mud or dirt* on the counter top." (Emphasis added.) Sanders further testified:

"Q. [D]id you have the ability to determine what shape the mud was in, if any?

A. It seems to be the more dirt from a ridge impression of a shoe.

\* \* \*

Q. Did you make any type of lift of these marks sir, on this counter top?

A. No.

Q. Did you do anything to preserve those mud or ridge impression that could be later used for some type of comparison identification?

A. No, I did not."

The mud, dirt and soil on the counter top, the kitchen floor, on the hallway carpet and in the living room at the crime scene was not procured or preserved by the officers or the evidence technician for a soil comparison and no explanation was offered for not having done so. The impossibility of a soil comparison of the mud and dirt footprints from the crime scene with whatever soil there was on the defendant's shoes was therefore the result of the officer's failure to procure and preserve the crime-scene soil with which to make the comparison. Thus, the laboratory technician's inability to conduct a soil comparison cannot be properly attributed to the majority's excuse that the "defendant's shoes had no dirt on them."[4]

The majority's assertion that the muddy footprint impressions "were too light to photograph" also requires clarification. When asked why he did not photograph the muddy footprints and ridge impression, crime laboratory technician Sanders attempted to explain:

"I looked at the impression through the camera and I didn't feel that there was enough of an impression that would show any photographs. And in my experiences it was not enough and *I didn't bother to photograph it because it would just be blank on the film.*" (Emphasis added.)

_____

[4]Sharon Ellis, a technician in the police crime laboratory and a defense witness, testified that "there was no trace materials in the [defendant's] shoes to be examined."

Sanders was not questioned about his camera equipment or its inability to photograph the muddy footprints and impressions which were clearly visible to his naked eye, as well as the naked eye of Detective Gallagher and the complainant. Sanders, in effect, testified that his Chicago police department crime laboratory camera could not photograph that which could be seen by the naked eye. In my judgment, this is far-fetched.

The Chicago police department evidence technician examined the crime scene for fingerprints. There was no evidence that the defendant's prints were found.

The complainant testified during the State's case in chief, not on direct examination but rather on cross-examination, that shortly before trial she was shown some garments by police officers and an assistant State's Attorney and that at that time she identified the garments as the garments worn by her assailant. She was not asked to identify these garments when she testified during the State's case in chief, however.

Strangely, Binkowski was not called as a State's witness. He was called as a defense witness, and on direct examination he related the aforementioned circumstances of the seizure of the defendant's clothing and shoes from his home. Binkowski identified the clothing as defendant's trial exhibits. Thereafter, during the State's case in rebuttal, the complainant belatedly was asked, for the first time, to identify the defendant's clothing Binkowski seized from the defendant's home—the faded blue jeans and the navy sweater—as the clothing which was worn by her assailant. Because this identification by the complainant of her assailant's wearing apparel was belated rebuttal testimony and because it was contradicted by Officer Colvin, the clothing-identification testimony lacks credence.

With Binkowski's extensive involvement and investigation in this case, and indeed his solution of the crime and his apprehension of the alleged offender, it is incredible that Binkowski did not prepare any police report of any of his activities. Binkowski testified:

"Q. By the way, you personally did not fill out a police report with regard to this incident, did you?

A. I personally did not, no sir.

Q. So most of what you're testifying to is as to memory?

A. Yes sir.

Q. You didn't record any of your investigation or work or anything on a police report or any type of a report?

A. No sir.

Q. You didn't reduce any of your investigation to any type

of writing at all?

A. None that I have knowledge of, no sir."

Regarding the items that were stolen, the complainant testified that the assailant took a gold chain and locket, money, her purse and a red Crickett cigarette lighter. The defendant did not have any of this robbery loot when he was arrested and none of it was found in the defendant's home by Officer Binkowski when he searched it. Nor was the long knife which was used in the attack found on the defendant's person or in his home. The majority again speculates that the defendant "had more than adequate opportunity to dispose of the victim's property." The unexplained exclusive possession of recently stolen articles creates an inference that the possessor knew the articles were stolen or that he may have been the thief. (*People v. Barber* (1974) 20 Ill. App. 3d 977, 979-80, 313 N.E.2d 491.) Whether the absence of the possession of recently stolen property by an accused creates a nonincriminating inference that the accused did not steal such property need not be decided. In my judgment, it is simply inappropriate in this case to make any inference of guilt from the defendant's lack of possession of the stolen property on the assumption that he had an adequate opportunity to dispose of it.

The defendant testified and denied committing the offenses. He further testified that when the offenses were committed he was playing cards in the building where he resided which was quite a distance from the complainant's home. He was corroborated in his alibi by his witness, Frederick Parham. The majority points out that "although Parham corroborated this [alibi] testimony, he never advised the police of defendant's whereabouts." No adverse inference can be derived from an alibi witness' refusal or failure to reveal an accused's alibi to law-enforcement officers and any suggestion that defendant's alibi lacked credibility because Parham did not do so or that the defendant would have benefitted had Parham done so is without merit.

The majority also asserts that the defendant and his alibi witness "had difficulty remembering the time, date and location of numerous other card games they had played in August 1981." Understandably so. The frequency of their card games would contribute to that difficulty, but more importantly, the defendant and Parham were not asked to establish an alibi for all their card games in August 1981; rather, they were called upon to establish that the defendant was at a card game at the time of the rape, which they did.

The majority comments that Jim Conway, with whom the defendant testified he was also playing cards at the time the offenses were

committed, was present at defendant's trial but did not testify. The State had the right to call and could have called Conway as a rebuttal witness and no doubt would have done so had Conway not played cards with the defendant at the time the defendant testified he did. No greater inference can be drawn from the defendant's failure to call Conway than can be drawn from the State's failure to call him.

The complainant's single identification testimony was uncorroborated. More importantly, her identification testimony was contradicted and impeached in every material particular. Her identification of the defendant as her assailant was grossly inaccurate and was wrought with numerous significant frailties. In this regard as well as the complainant's lineup identification of the defendant, the following language of the Supreme Court in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, is most appropriate:

> "Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on ***.'
>
> The pretrial confrontation for purpose of identification may take the form of a lineup, also known as an 'identification parade' or 'showup,' as in the present case, or presentation of the suspect alone to the witness, as in *Stovall v. Denno* [(1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967]. It is obvious that risks of suggestion attend either form of confrontation and increase dangers inhering in eyewitness identification. *** Lineups are prevalent in rape and robbery prosecutions and present a particular hazard that a victim's understandable outrage may excite vengeful or spiteful motives.
>
> * * *
>
> The few cases that have surfaced therefore reveal the existence of a process attended with hazards of serious unfairness to the criminal accused and strongly suggest the plight of the more numerous defendants who are unable to ferret out suggestive influences in the secrecy of the confrontation. We do not assume that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." 388 U.S. 218, 229-30, 234-35, 18 L. Ed. 2d 1149, 1159, 1161-62, 87 S. Ct. 1926, 1933-34, 1936.

The complainant's identification of the defendant as her assailant in the case at bar is a prime example to which the Supreme Court

referred in *Wade*. Having picked out the defendant's picture and thereafter identified the defendant in the lineup as her assailant, the complainant was *not likely to go back on her word later on* even though she later learned that the defendant had a knot and scar over his eyes and a goatee, even though there were decided variations between the assailant's description and wearing apparel the complainant gave to the police and the defendant's actual description and wearing apparel, even though the officers' testimony contradicted the complainant's testimony, in spite of the meteorologist's testimony that there could not have been moonlight in the complainant's room when the offenses were committed, even though none of the robbery loot or the weapon was found in the defendant's possession, even though the defendant consented to the search of his home, even though no crime-scene evidence was traced to the defendant, in spite of the defendant's practically unblemished background and in spite of the defendant's denial and alibi. A cursory review of the complainant's testimony reveals her willingness, indeed desire, to modify her testimony not because of the certainty of her identification or to give credence to it, but rather to avoid going back on her word.

Uniquely, in this case it was the defendant who called as his witness Officer Thomas Sheehan who, with his partner, were the first officers who arrived at the complainant's home and who testified about the complainant's description of her assailant and his investigation of the case. The defendant also called the Chicago police department evidence technician as his witness who testified about his investigation of the crime scene, the broken window, the muddy footprints, taking pictures and dusting for fingerprints. As previously pointed out, Chicago police officer Raymond Binkowski was a defense witness. The defendant even called Chicago police crime laboratory technician Sharon Ellis, who testified that she chemically and microscopically examined the defendant's clothing and shoes given to her by Officer Binkowski. Her examination revealed nothing which would connect the defendant with the offenses.

The majority points out that "these items of clothing were recovered two days after the offenses were committed" and then speculates that the defendant had "ample time to remove any incriminating physical evidence." This speculation is unjustified. The assistant State's Attorney did not ask crime laboratory technician Ellis on cross-examination if the defendant's garments had been recently laundered so as to possibly remove any incriminating evidence and he did not even ask whether laundering of the garments would re-

move incriminating evidence from them. In fact, the assistant State's Attorney did not cross-examine Ellis.

The defendant also called Mr. Peterson, the meteorologist, and Chicago police officer Colvin, by stipulation. The complainant and Officer Gallagher, who added nothing to the State's case, were the only witnesses called by the State.

The evidence in this case affirmatively and convincingly established that Bruce Nims was mistakenly identified as the complainant's assailant and that he was unjustly convicted. Deplorable crimes were committed upon the complainant, but she does not benefit from this conviction, nor is the community thereby protected. This conviction may swell the prosecutorial statistics, but the true culprit is still at large in the community and quite probably continues to prey and wreak havoc on it.

The facts of the many cases on this subject are rarely, if ever, analogous but those cited below are applicable to and controlling in the case at bar. In each case the defendant's conviction was based on one person's uncorroborated identification testimony but was reversed because the evidence failed to establish guilt beyond a reasonable doubt. *People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1; *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434; *People v. Moore* (1972), 6 Ill. App. 3d 932, 287 N.E.2d 130; *People v. Laurenson* (1971), 131 Ill. App. 2d 2, 268 N.E.2d 183; *People v. Martin* (1968), 95 Ill. App. 2d 457, 238 N.E.2d 205; *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133; *People v. Barney* (1965), 60 Ill. App. 2d 79, 208 N.E.2d 378.

Defendant, Bruce Nims, should not be imprisoned for 25 years on the evidence in this case. The evidence failed to establish beyond a reasonable doubt that he was the assailant. "Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed." (*People v. McGee* (1961), 21 Ill. 2d 440, 444, 173 N.E.2d 434.) In this case, the evidence established beyond a reasonable doubt that Nims was not the assailant. His convictions and sentences should be reversed.